Baldassarre v. Rare Metals Derivatives, Inc., Appellant.

Argued April 21, 1971. Before JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Arthur L. Jenkins, Jr.,* with him *Smith, Aker, Grossman & Hollinger,* for appellant.

*John Paul Curran,* with him *Parke H. Ulrich,* for appellees.

OPINION BY MR. JUSTICE O'BRIEN, October 12, 1971:

Appellees, Alex P. Baldassarre and Edward C. Mesiti, are research chemists. Around the middle of 1963, while both chemists were in the employ of different companies, Ogden FitzSimons, a chemical engineer, arranged a meeting between Mesiti and William G. Singer, Jr., president of Rare Metals Derivatives, Inc. (Rare Metals), at FitzSimons' office, for the purpose of discussing employment of Mesiti and his friend, Baldassarre, by Rare Metals. At that meeting, it was agreed that the corporation would initially employ Baldassarre and Mesiti would not join the operations until later.

A second meeting was held on November 8, 1963, at the Coach Inn, Fort Washington, Pennsylvania, attended by Singer, FitzSimons and Baldassarre. Baldassarre explained that he was interested in becoming an owner as well as an employee if he were to quit his then-current job and go to Rare Metals. He and Singer, acting as president of Rare Metals, agreed that he (Baldassarre) and Mesiti would both come to work for Rare Metals at an annual salary of $13,000 each, plus ten percent of the stock of Rare Metals, which was to be divided between them.

In January of 1964, after quitting his previous job, Baldassarre began his employment with Rare Metals. Mesiti joined him in June of the same year. The two

chemists, during the next year, exerted their full energies and professional talents on behalf of Rare Metals. Nevertheless, the enthusiasm which all shared in November of 1963 began to diminish when Singer kept postponing his obligation to transfer ten percent of the company stock to the two chemists. The two chemists made repeated efforts to reduce their oral agreement to writing, but they were unsuccessful, and were eventually discharged in June of 1965.

On September 5, 1967, the two chemists filed a complaint in equity seeking, *inter alia,* that Rare Metals be ordered to transfer five percent of its stock to each of them.[1] A hearing on September 15, 16 and 17 of 1969 led to a decree nisi ordering Rare Metals to make the requested transfers. After appellant's exceptions were dismissed, and the decree nisi was entered as a final decree, Rare Metals brought this appeal.

Appellant alleges *two reasons* why the chancellor's decree should be reversed. Neither one has merit. The first argument is based on §8-319 of the Uniform Commercial Code, which reads as follow:

"A contract for the sale of securities is not enforceable by way of action or defense unless

"(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

"(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

---

[1] Appellees also alleged that they were promised twenty-five percent of the net profits and savings resulting from the innovations instituted by them, but the chancellor found that the conversations on these matters were too vague to be an integral part of the contract of employment.

"(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

"(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price." Act of April 6, 1953, P. L. 3, §8-319, eff. July 1, 1954. Reenacted October 2, 1959, P. L. 1023, §8, eff. January 1, 1960, 12A P.S. 8-319.

By its own terms, §8-319 only applies to "a contract for the sale of securities." We are not convinced that this section is applicable to the transaction in question. Although "sale of securities" is nowhere defined, §2-106 defines "sale" as: "A 'sale' consists in the passing of title from the seller to the buyer for a price." There is no "price" for stock transferred pursuant to an employment contract. The only consideration is the employment itself. If appellant is correct that an employment contract is a sale for purpose of §8-319, the Uniform Commercial Code's statute of frauds on securities, then the two chemists, by leaving their previous employment and working for Rare Metals, have made "payment" for the stock, and thus are entitled to enforce their oral contract under the terms of §8-319 (b). However, we do not believe that such an awkward use of language is necessary. We believe it much more reasonable to state that the contract in question is simply not a contract of sale.

In this way, the case is analogous to the case of *Stone v. Krylon, Inc.*, 141 F. Supp. 785 (E.D. Pa., 1956), where an oral contract for the sale of a franchise was involved. In *Stone*, the court reasoned: "The

contract here, however, is not a contract of sale. In essence it is a contract involving two principal elements: (a) plaintiff's performance of certain personal services for defendant and (b) defendant's promise to grant plaintiff the exclusive agency to sell certain goods. This is a contract of employment, the consideration for the services being not wages or salary but a valuable franchise."

We believe that the chancellor was correct in refusing to consider the instant agreement an agreement for the sale of securities so as to make U.C.C. §8-319 applicable.

Appellant's second contention is that appellees failed to prove the existence of an oral agreement requiring Rare Metals to transfer ten percent of its stock to them.[2] We recently stated the standards for reviewing a chancellor's finding in *Yuhas v. Schmidt*, 434 Pa. 447, 258 A. 2d 616 (1969), at pp. 453-54: "We are mindful that the findings of the Chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law [citing cases] and the findings have the full force of a jury verdict and, if supported by sufficient evidence and if affirmed by the court en banc, will not be disturbed on appeal [citing case]. As we stated in *Masciantonio Will*, 392 Pa. 362, 367, 141 A. 2d 362 (1958), 'The test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witness, "but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor." ' "

An examination of the record discloses ample evidence upon which the chancellor could properly reach

---

[2] This contention goes to the very existence of an agreement, not to the authority of Singer to bind the corporation.

his conclusion. During the course of the trial, Baldassarre testified as follows about his meeting with Singer and FitzSimons in November of 1963: "Q. Now, other than the technological aspects, what other discussions, if any, took place at that meeting? A. I gave my end and I asked Mr. Singer what we had discussed in the past, definitely would not go in without an interest in the company and I wanted ten per cent which would be divided between Mr. Mesiti and myself. This was ten per cent of the company's stock and we discussed salary. There was a little haggling on salary. I said we wanted $13,000 each and Mr. Singer finally, after much talk, it took a good part of the night, agreed to both of these, and he was very enthusiastic over our discussion of new products, the technology we would bring, and we shook on it and confirmed—cemented the agreement in the presence of Mr. FitzSimons."

FitzSimon's testimony concerning the meeting corroborates that of Baldassarre. Consequently, we will not disturb the chancellor's findings.

Decree affirmed, costs to be borne by appellant.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.