## Butcher, et al. *v.* United States Investment Corp., Appellant.

Argued June 11, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Thomas M. Garrity*, with him *Michael J. Clement*, and *Wisler, Pearlstine, Talone, Craig & Garrity*, for appellant.

*Bernard Chanin*, with him *Leonard J. Bucki, Seymour Kurland*, and *Wolf, Block, Schorr and Solis-Cohen*, for appellees.

OPINION BY HOFFMAN, J., September 22, 1975:

This appeal is taken from an order dismissing appellant's counterclaim on the grounds that it was barred by the Statute of Frauds contained in Article 8 of the Uniform Commercial Code, dealing with investment securities.[1]

The plaintiffs-appellees are two firms engaged, *inter alia*, in the business of underwriting the sale of secu-

---

1. Act of April 6, 1953, P.L. 3, §8-319, eff. July 1, 1954; reenacted October 2, 1959, P.L. 1023, §8, eff. Jan. 1, 1960; 12 A P.S. §8-319.

rities; the defendant-appellant is a Pennsylvania corporation. In 1972, the parties entered into negotiations regarding the underwriting of a proposed public offering of the company's common stock. On June 6, 1972, the parties signed a "letter of intent" under which the appellees agreed to act as co-managing underwriters of the proposed public offering and sale of the company's common stock. The contemplated issue consisted of 180,000 shares to be offered at $20.00 per share, with an underwriting discount of 7½%. The letter of intent, however, is largely conditional:

"The feasibility of the financing and the estimated offering price set forth below will depend, of course, on our further investigation of the Company . . . the absence of any material adverse change in the Company's condition or prospects (financial or otherwise), and the continuing existence of favorable market conditions in general and our ability to obtain indications of interest from prospective dealers and customers. This letter summarizes and evidences our discussions to date, although our mutual rights and obligations remain to be defined in an underwriting agreement (the 'Underwriting Agreement') into which this letter and all prior discussions shall merge."

". . . This letter is intended to be only a summary of the proposed transaction contemplated hereby and the Underwriting Agreement and related documents and instruments which will be executed by parties will contain the usual warranties, representations, marketouts and indemnities. Accordingly, this letter shall be construed only as a letter of intent and shall not be legally binding upon the Company or us; *provided, however, that you and we shall immediately be legally bound by paragraphs 3 and 4.*" (Emphasis added.)[2]

2. Paragraph 3 provides that the Company will pay all expenses incurred in connection with the preparation and printing of the registration statement and the prospectus, the underwriting

On April 26, 1974, the underwriters filed a complaint alleging that after they had incurred expenses in the amount of $57,668.91 pursuant to Paragraphs 3 and 4 of the letter of intent, the company abandoned the proposed public offering. The answer filed by the company denied that it had abandoned the public offering, and counterclaimed for damages against the underwriters, alleging an oral agreement entered into after the letter of intent and subsequently breached by the underwriters:

"... subsequent to June 6, 1972, the plaintiffs and the defendant orally agreed to increase the number of shares to be purchased by the defendant for the purpose of the public offering from 180,000 shares of defendant's common stock to 360,000 shares of such stock and that, on or about July 28, 1972, the plaintiffs and the defendant entered into an oral agreement whereby plaintiffs agreed to become legally bound to unconditionally purchase 360,000 shares of the common stock of U. S. Investment Corporation at $10.00 per share for the purpose of offering same to the public at that price in consideration of the defendant paying for an additional and special audit to ... confirm defendant's earnings for the six month period ending June 30, 1972."

The counterclaim alleges that the underwriters refused to proceed with the offering unless the price of purchase and resale to the public was reduced to $8.00 per share. Allegedly, this breach occurred on November 13, 1972, one day prior to the filing of the Registration Statement

documents, all "blue sky" materials, the stock certificates and other instruments required in connection with the public offering.

Paragraph 4 provides that the Company will reimburse the underwriters for the cost of complying with the securities laws of such states as the underwriters request, including legal fees. Further, Paragraph 4 provides that should the offering be abandoned, the Company will reimburse the underwriters for other fees of their counsel.

**12**

with the Securities and Exchange Commission. Defendant sought damages in the amount of $224,638.54.

On August 8, 1974, the underwriters filed preliminary objections to the defendant's counterclaim, alleging that "[u]nder the Pennsylvania Statute of Frauds, . . . a contract for the sale of securities is not enforceable by way of action or defense unless there is some writing signed by the party against whom enforcement is sought.[3] After oral argument and consideration of the briefs submitted by both sides, the lower court granted the preliminary objections and dismissed the counterclaim. This appeal followed.

In an attempt to avoid the bar of the statute of frauds, appellant makes six claims, only four of which need be discussed in depth.[4]

---

3. See note 1, supra. Section 8-319 reads in relevant part: "A contract for the sale of securities is not enforceable by way of action or defense unless (a) there is some writing signed by the party against whom enforcement is sought . . . sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price . . ."

4. Appellant contends that the statute of frauds is improperly raised by preliminary objections because §8-319(d) provides that a contract for the sale of securities is enforceable if "the party against whom enforcement is sought admits in his pleadings, *testimony or otherwise in court* that a contract was made for sale of a stated quantity of described securities at a defined or stated price." (Emphasis added). Appellant argues, therefore, that it is premature to dismiss its counterclaim prior to trial, because the underwriters may admit at a later stage that the oral contract actually existed. Although not stated in these terms, appellant is arguing that the underwriters erroneously invoked Rule 1017 (b) (4). Pa.R.C.P. Rule 1017(b) (4) states that "preliminary objections are available to any party and are limited to (4) a demurrer, which may include the bar of a *nonwaivable* statute of limitations or frauds which bars or destroys the right of action and the applicability of which appears on the face of the complaint or counterclaim . . ." (Emphasis added). The statute of limitations contained in §8-319 is waivable by virtue of subsection (d). There-

Appellant first contends that its right of recovery is not predicated on the oral contract alleged in its counterclaim, but, in its words, "upon the Underwriters' inducement which is independent of a contract for the sale of securities." Appellant's counterclaim states that the parties entered into an oral agreement whereby the underwriters agreed to become legally bound to purchase unconditionally 360,000 shares of appellant's common stock in consideration of appellant's paying for an additional and special audit. Appellant never makes clear what "inducement" it relied upon. It seems obvious, however, that the "inducement" in fact was the oral contract to purchase securities. That contract, however, is unenforceable by virtue of the statute of frauds. That being the case, appellant has failed to allege any enforceable legal obligation on the part of the underwriters which can give rise to recovery. As the lower court succinctly stated: "Here, defendant is suggesting that its right of action is independent of any contract. Although such a position suc-

---

fore, the proper procedure for raising the issue would be to file a responsive pleading asserting the defense under the heading "New Matter". See Rule 1030, Pa. R.C.P. Although appellant's argument does have merit, this issue was not presented to the lower court. It is too well-settled that an issue cannot be presented for the first time on appeal to argue otherwise. See, e.g., *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974). Furthermore, had the underwriters asserted the defense of the statute of frauds in a responsive pleading, they then would have been able to file a motion for judgment on the pleadings pursuant to Rule 1034, Pa. R.C.P.

The second argument which can be dealt with summarily is that the underwriters have waived the requirement of a writing because they fraudulently induced appellant to undergo the expense of an additional six-month audit. The lower court held that the record contained no evidence to support an allegation of fraud. Moreover, it is obvious that the crux of appellant's counterclaim is the existence of an oral contract which was allegedly breached. The counterclaim clearly seeks damages for breach of contract, not for fraud. This claim is dismissed as without merit.

ceeds in avoiding a statute of frauds defense, it also eliminates the legal right by which defendant may seek to enforce its claim." Thus, appellant is in the position of attempting to enforce an unenforceable obligation, or seeking relief in assumpsit on some unknown obligation on the part of the underwriters. In either case, appellant has failed to state a cause of action upon which relief can be granted.

Appellant next argues that because the counterclaim does not seek specific performance, it can recover for the reasonable value of the services it performed in reliance upon the underwriters' inducement. In effect, the company is requesting relief on a theory of quantum meruit. Again, the company is attempting to avoid its own theory of the case, which is to recover damages for breach of contract. The one case cited by appellant, *Kessler v. M. J. Greene Co., Inc.*, 39 D. & C. 2d 717 (1966) (Opinion by PRICE, J.), was properly distinguished by the court below.

In *Kessler*, plaintiff originally filed a suit in equity, alleging that defendant-company had orally agreed to grant him an option to purchase 7,500 shares of its stock, if plaintiff procured a broker to handle its public offering. The suit asked for specific performance and $2,000 damages, the reasonable value of accounting and pre-registration services performed by plaintiff. Preliminary objections were sustained insofar as the complaint asked for specific performance. The request for damages was transferred to the law side of the court. Subsequently, plaintiff sued to recover $15,000, the alleged reasonable value of the services performed by plaintiff in obtaining a broker for defendant. Again, the company filed preliminary objections. The court concluded that plaintiff could maintain its suit: " 'In applying the statute of frauds, the case is one where the parties made an express contract, but the law prevents its enforcement. **If the defendant expressly promised to convey Blackacre, the law does not infer a promise on his part to repay an**

installment of the purchase money on refusal to convey, any more than it infers a promise to pay damages for his breach. *His duty to repay is based upon the fact that he is proved to have made a promise that he is bound in honor to perform, that he is trying to keep something for nothing, and that he is hiding behind a statute that was enacted only for the purpose of preventing the enforcement of promises that never were made*': 2 Corbin on Contracts 158, §321." *Kessler,* supra at 720 (Emphasis in original).

Quantum meruit, therefore, is predicated on the existence of an unjust enrichment. It would be unfair to allow one party to an unenforceable contract to accept the performance of the other party and receive a material benefit without assuming any obligation. Thus, the law allows the plaintiff to recover the reasonable value of the services he performed and the expenses he incurred. In applying these principles to the facts of *Kessler,* the court correctly permitted the plaintiff to proceed to trial because he had alleged that his procurement of a broker was reasonably worth $15,000. See also *Redditt v. Horn,* 361 Pa. 533, 64 A. 2d 809 (1949), where the Court dismissed preliminary objections because the plaintiff alleged that he had designed apartment buildings and supervised their construction but had not received any compensation because the oral contract was unenforceable.

In the instant case, appellant claims that "[w]hen the Company procured an additional six month audit for the Underwriters, the Underwriters did receive and accept a material benefit. . . . With the additional audit, the Underwriters had a more concrete basis with which to rate the probable success of a public issue of Company stock in the most current market conditions." The allegation of material benefit, however, is completely disproved by the allegations forming the basis of the counterclaim. Appellant claims that the underwriters agreed

to become legally bound to purchase unconditionally 360,000 shares of the company's stock. Thus, accepting these facts as true, the underwriters were bound to purchase the shares regardless of the results of the additional audit. Appellant claims that "[w]ithout the audit, the Underwriters would have had to make their decisions upon educated guesses, projections and extrapolated financial data concerning the Company's performance." But the additional audit could not possibly confer a benefit upon the underwriters because they were already obligated to purchase the stock. Therefore, from the underwriter's viewpoint, the most the additional audit could have accomplished was to determine whether their decision to underwrite the offering was unwise.

Appellant also contends that the oral contract alleged in its counterclaim is not barred by the statute of frauds because it is a contract of employment rather than a contract for the sale of securities: ". . . the Pennsylvania statute of frauds dealing with the sale of securities has been held inapplicable to contracts of employment. . . . It is Pennsylvania's view that transfers of securities pursuant to an employment contract simply are not sales." *Hiller v. The Franklin Mint, Inc.*, 485 F. 2d 48, 51 (3d Cir. 1973). See also *Baldassarre v. Rare Metals Derivatives, Inc.*, 444 Pa. 100, 282 A. 2d 262 (1971). Appellant's conclusion is obviously a correct statement of the law of Pennsylvania. The difficulty with appellant's argument, however, is that the facts alleged in the counterclaim simply cannot support the conclusion that the oral contract was one of employment.

In *Hiller,* the complaint alleged that the defendant-company orally agreed to pay plaintiff a "finder's fee" if plaintiff were able to locate a source of additional funds for the company. The fee was alleged to be an option to purchase 5,000 shares of the company's stock at $30 per share. Plaintiff did find a brokerage house willing to

underwrite the company's public offering, but the company refused to grant plaintiff the option. The Court held that the complaint alleged a contract of employment and, therefore, was not barred by the statute of frauds. In the instant case, however, the counterclaim alleged that the underwriters were legally bound to purchase 360,000 shares at $10 per share. Unlike *Hiller*, the "employee" is *required* to make a substantial cash outlay. Furthermore, it is interesting to note that the counterclaim alleges that the underwriters agreed to purchase the stock at $10 per share "for the purpose of offering same to the public *at that price. . . .*" (Emphasis added). Thus, the employee is required to purchase the shares at the same price that an ordinary investor would pay. Under the terms of the counterclaim, the underwriters could not make a profit. Thus, the counterclaim cannot possibly allege a contract of employment because it fails to allege any compensation for the alleged employee.

Similarly, *Baldassarre v. Rare Metals Derivatives, Inc.*, supra, provides no support for appellant's argument. There, the complaint alleges that the defendant-company orally agreed to hire plaintiffs at a salary of $13,000 per year plus 5% of the company's stock. The Court held that the complaint was not barred by the statute of frauds. Unlike the instant case, however, the plaintiffs in *Baldassarre* were not required to make payment in order to receive the stock; according to the complaint, the transfer was viewed as pure compensation for services rendered. In the present case, the underwriters, according to the counterclaim, were required to tender payment of $3,-600,000 before they could receive the stock. This hardly amounts to an allegation of an employer-employee relationship.

Finally, appellant argues that because the Uniform Commercial Code does not define "sale of securities," the definitions found in the Securities Act of 1933

should control. Section 2(3) of the Act,[5] in defining "sale," provides: "The terms defined in this paragraph . . . shall not include preliminary negotiations or agreements between an issuer . . . and any underwriter . . ." Appellant's brief advances no reason for adopting this definition for the purposes of interpreting the Pennsylvania statute of frauds. Obviously, the considerations of the federal securities law are not necessarily the same as those of a state statute of frauds for the sale of securities. In essence, the reason for the exemption of agreements between issuers and underwriters from the definition of "sale" is simply to remove them from the operation of §5 of the Act. Without the exception, it would be unlawful for an issuer to offer to sell its stock to a prospective underwriter, unless it had already filed a Registration Statement with the Securities and Exchange Commission. This would force a company which is considering making a public offer to expend the sums necessary to file with the SEC before it had commitments from underwriters to purchase its stock. The Pennsylvania statute of frauds contained in §8-319 of the Code is not designed to regulate the marketing of securities, but deals only with "contracts for the sale of securities." Furthermore, the reference to the Securities Act is not precisely on point. Appellant argues that because the Code does not define "contract for the sale of securities," we should adopt the definition of "sale" used in federal securities law. If this approach were valid, it would make much more sense to use the definition of "sale" contained in Article 2 of the Code, which is the passing of title from seller to buyer for a price. See §2-106. Neither, however, defines "contract for the sale of securities." The contract

5. Securities Act of 1933, May 27, 1933, c.38, Title I, §2, 48 Stat. 74; June 6, 1934, c. 404, Title II, §201, 48 Stat. 905; Aug. 10, 1954, c. 667, Title I, §§1-4, 68 Stat. 683; June 25, 1959, P.L. 86-70, §12(a), 73 Stat. 143; July 12, 1960, P.L. 86-624, §7(a), 74 Stat. 412; Dec. 14, 1970, P.L. 91-547, §27(a), 84 Stat. 1433.

alleged in the counterclaim, however, is obviously one for the sale of securities.

Because appellant has failed to remove the oral contract from the purview of the statute of frauds, the lower court properly granted appellees' preliminary objections and dismissed appellant's counterclaim.

The order of the lower court is affirmed.

JACOBS, J., concurs in the result.