627 A.2d 60

**Michael K. JONES**

v.

**CECIL SAND AND GRAVEL, INC.**

**No. 1628, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 7, 1993.

Certiorari Granted Nov. 23, 1993.

Michael J. Scibinico, II (Jodlbauer, Lidums & Scibinico, on the brief), Elkton, for appellant.

Leonard A. Sacks, Rockville, for appellee.

Argued before MOYLAN, BLOOM and WENNER, JJ.

BLOOM, Judge.

A dispute over an alleged oral agreement for a stock interest in a newly formed sand and gravel mining corporation forms the basis of this appeal. The Circuit Court for Cecil County, in an action for specific performance, money damages, and other relief brought by appellant, Michael K. Jones, against appellee, Cecil Sand & Gravel, Inc., based its award of

judgment in favor of the defendant at the conclusion of the plaintiff's case on § 8–319 of the Commercial Law Article of the Maryland Code. We believe that § 8–319 is inapplicable to the contract between the parties and, accordingly, we shall reverse the judgment.

*Facts*

The following facts, brought out during the presentation of the plaintiff's case, represent appellant's version of the matter in dispute.

In the spring of 1985 appellant was invited to join in the development of a new sand and gravel mine in Cecil County, Maryland. After viewing and making an evaluation of the mining site, appellant met with William Franey, an investor and the eventual treasurer of the company. Franey asked appellant to prepare a written development plan. Subsequently a meeting was held between appellant, Mr. Franey, and Mr. John Driggs, a potential investor in the project. At that meeting, appellant stated that he was interested in the project only if he were given equity in the operation. Mr. Driggs indicated that Mr. Franey had authority to make such arrangements. An oral agreement was reached between Mr. Franey and appellant. It provided for appellant to contribute the use of his equipment and to prepare the site for mining operations. In exchange, appellant was to receive a 25% stock interest in the business upon its incorporation.

The next week appellant was advised to and did commence work on the site preparation. To accomplish this, he employed four full-time employees and proceeded to supervise the rehabilitation of the property, using parts and equipment taken from a site owned by appellant in Crofton, Maryland. The equipment taken from the Crofton site included a radial stacker, several conveyor belts, material screws, scalping tanks, and slurry pumps. Other equipment, including heavy machinery, loaders and dozers, all owned by appellant, were employed in the rehabilitation effort. At the trial, appellant testified that the rental value of the equipment totaled $510,-

000. Considerable disparity exists between the rental price and the price of $140,000, at which appellant was to sell the equipment to the corporation.

Prior to his employment at Cecil Sand & Gravel, appellant incurred a $145,000 payroll tax debt to the Internal Revenue Service for his business in Crofton, Maryland. In January of 1986 the I.R.S. sold part of appellant's equipment from the Crofton site. At that time, appellant sought to liquidate the equipment in order to pay the I.R.S. debt. Ultimately the equipment was sold to the newly formed corporation after a three year lease period; appellant's wife was paid $3,900 per month during the leasing period.

Appellant did not receive any stock in the corporation. During the negotiations for the equipment purchase, appellant again raised the issue of stock ownership; the existence of the I.R.S. claim was offered as the reason for the delay in stock transfer. In December of 1988 appellant obtained a copy of the company's Articles of Incorporation and questioned whether the corporation had been properly formed and whether stock had been issued. Appellant was told that his request for stock was delayed by the need to prepare "mid-year financials." Appellant received a letter dated 22 December 1988 from Blaine Brownlow, appellee's vice president, which stated that after the financial data was processed appellant's interest in equity and profit sharing would be clarified. In February of 1989 appellant received a check and a stock certificate order form, from which he assumed that his request for the issuance of stock was progressing. On 26 June 1989 appellant was fired by Mr. Franey. Appellant questioned Mr. Franey's authority to fire him; ultimately a letter from the board of directors terminated appellant's employment as president of the corporation. After making written demands for the issuance of stock, appellant filed this suit.

A non-jury trial began on 27 April 1992. Appellee moved for judgment at the close of appellant's case pursuant to Rule 2–519. Argument was heard on 22 June 1992, at which time Judge Edward Rollins, Jr. granted appellee's motion for judg-

ment. The court held that a contract for the sale of securities is not enforceable unless in writing as provided in Commercial Law Article § 8–319. A written order to this effect was entered on 29 July 1992, and this appeal was filed 25 August 1992.

Appellant presents the following issues for our review:

1. Whether the trial court erred in considering appellant's claim for stock ownership in a new corporation to be formed by the parties as one for a "sale of securities" subject to Commercial Law Article § 8–319.

2. Whether, if applicable at all, the provisions of Commercial Law Article § 8–319 were satisfied by actual payment of the consideration claimed, or an admission of the Appellee as to the agreement.

3. Whether the act of allowing the free use of equipment and machinery with an uncontroverted rental value of $510,000 to a new corporation does, in itself, necessarily and unequivocally demonstrate the existence of an underlying contract for equity ownership in the corporation such as to take the case outside of the Statute of Frauds under the doctrine of part performance.

*Application of U.C.C. § 8–319*

■ Appellant contends that the circuit court erred in concluding that his agreement to acquire stock in the corporation constituted a sale of securities governed by the statute of frauds, § 8–319, under the Uniform Commercial Code. We agree.

Section 8–319(a) of the Commercial Law Article of the Annotated Code of Maryland (1992 Repl.Vol.) provides that a "contract for the sale of securities is not enforceable by way of action or defense unless" there is a signed writing that indicates "that a contract has been made for sale of a stated quantity of described securities at a defined or stated price." The term "sale" is defined in § 2–106 as "the passing of title from the seller to the buyer for a price."

In *Baldassarre v. Singer*, 444 Pa. 100, 282 A.2d 262 (1971), the Supreme Court of Pennsylvania addressed an identical issue. Two research chemists had orally agreed to join a chemical company provided that they each receive an annual salary of $13,000 and 10% of the company stock to be divided between them. When the company failed to transfer the stock or reduce the agreement to writing the chemists brought suit. The Court of Common Pleas of Montgomery County, Pa., ordered the company to make the requested transfer. On appeal the Supreme Court of Pennsylvania determined that U.C.C. § 8–319 was inapplicable to an employment contract. We believe that court's rationale is instructive and proper:

> By it own terms, § 8–319 only applies to "a contract for the sale of securities." We are not convinced that this section is applicable to the transaction in question. Although "sale of securities" is nowhere defined, § 2–106 defines "sale" as "A 'sale' consists in the passing of title from the seller to the buyer for a price." There is no "price" for stock transferred pursuant to an employment contract. The only consideration is the employment itself. If appellants are correct that an employment contract is a sale for purpose of § 8–319, the Uniform Commercial Code's statute of frauds on securities, then the two chemists, by leaving their previous employment and working for Rare Metals, have made "payment" for the stock, and thus are entitled to enforce their oral contract under the terms of § 8–319(b). However, we do not believe that such an awkward use of language is necessary. We believe it much more reasonable to state that the contract in question is simply not a contract of sale.

*Baldassarre*, 282 A.2d at 264.

Several courts have employed the same approach and treated such transactions as contracts for employment rather than as contracts for the sale of stock. *See McDermott v. Russell*, 523 F.Supp. 347, 350–51 (E.D.Pa.1981) (court refused to dismiss action based on evidence of an oral contract for the delivery of stock in exchange for services); *Hiller v. Franklin Mint, Inc.*, 485 F.2d 48, 51 (3d Cir.1973) (arrangement treated as contract for employment); *Spinney v. Hill*, 81 Minn. 316,

84 N.W. 116 (1900) (in an action to recover damages and the par value of promised stock the court rejected defendant's argument that the compensation in stock shares was a sale of chattel). In *Spinney v. Hill,* 81 Minn. 316, 84 N.W. 116 (1900), the Supreme Court of Minnesota decided that "[a]n agreement to pay for one's services in goods, chattels, or choses in action is not a sale, within the letter or the spirit of the statute of frauds. It is a mere agreement as to the method of compensation." *Id.* 84 N.W. at 117. We are compelled by the forceful logic of this statement. Other courts have construed "payment" to include the act made in reliance on the contract. *See Cumming v. Johnson,* 616 F.2d 1069, 1073 n. 4 (9th Cir.1979).

In *Burns v. Gould,* 172 Conn. 210, 374 A.2d 193 (1977), the Supreme Court of Connecticut found the *Baldassarre* court's rationale regarding the price term to be unpersuasive. The Connecticut court treated "price" as "something which one ordinarily accepts voluntarily in exchange for something else ... the consideration given for the purchase of a thing," quoting *Black's Law Dictionary* (Rev. 4th Ed.), and concluded that the plaintiff's action met the requirements of this definition. In *Burns,* the plaintiff, who had joined with the defendant in developing a convalescent home and forming a corporation for it, received 25% of the stock of the corporation with an option to buy an additional 24% of the stock for $12,000. The defendant later formed another corporation to develop a nursing home, but none of its stock was issued to the plaintiff. The plaintiff alleged that the parties had an oral agreement concerning the second corporation, in which plaintiff was to receive for his services in developing the project the same percentage of stock ownership—25% immediately with an option to purchase 24% of the stock for $12,000. The Connecticut appellate court, reversing the trial court, held that the statute of frauds section of the UCC was applicable to the transaction. The court apportioned plaintiff's recovery based on the amount of stock actually paid for by plaintiff through his services.

In *Burns*, the court analogized the treatment of contracts for the sale of goods in exchange for a price paid in realty or goods under Article 2 (Sale of Goods) of the UCC to the employment contract situation. We believe that a contract for employment is substantially different from a contract in which the price is paid in realty or goods. Section 2–304(1) of the Maryland Commercial Law Code provides that the contract price for the sale of goods may be "payable in money or otherwise. If it is payable in whole or in part in goods each party is a seller of the goods which he is to transfer." This provision, however, does not imply that any contract that may be paid for in goods is a contract for the sale of goods. Under the particular facts of this case, appellant contracted to prepare the site for a sand and gravel removal operation, an employment undertaking that clearly involved appellant's performance of a service,[1] in exchange for a percentage of stock in a corporation to be formed.

For the above reasons, we find the *Burns* decision to be unpersuasive and we reject its rationale, the application of Article 2 of the UCC, governing the sale of goods, to an employment contract. Moreover, we find the *Burns* case to be distinguishable from this case on the facts and on the basis of Maryland's corporation law. The UCC statute of frauds, § 8–319 of the Commercial Law Article of the Maryland Code, requires, for the sale of securities, a writing sufficient to

---

1. Maryland has established two tests for determining whether a contract is for the sale of services or goods. In *Anthony Pools v. Sheehan*, 295 Md. 285, 455 A.2d 434 (1983), the Court of Appeals employed the gravamen test which requires that consumer goods retain their character after the completion of performance to determine whether the Maryland U.C.C. provisions concerning implied warranties apply. In *Burton v. Artery Co.*, 279 Md. 94, 367 A.2d 935 (1977), the Court of Appeals determined that a contract requiring the furnishing and planting of hundreds of trees, shrubs, and sod was a contract of sale and not of services under the predominant factor test—"the thrust, the purpose, reasonably stated, is a transaction of sale with labor incidentally involved." *Id.* at 114–15, 367 A.2d 935. *See also Miles Laboratories v. Doe*, 315 Md. 704, 724–25, 556 A.2d 1107 (1989), *later proceeding*, 927 F.2d 187 (4th Cir.Md.1991); *DeGroft v. Lancaster Silo Co.*, 72 Md.App. 154, 168–70, 527 A.2d 1316 (1987). In the instant case appellant's services, rather than the stock transfer, were clearly at issue.

indicate a contract of sale "of a stated quantity of described securities at a defined or stated price." That statute is obviously intended to apply to an agreement to sell an ascertainable quantity of shares of a particular stock at a stated or ascertainable price. In *Burns,* as in this case, the quantity of stock allegedly sold by oral agreement was a fixed percentage rather than a stated number. With respect to a corporation to be formed at a later date, a fixed percentage would seem to be a more definite quantity than a stated number of shares, since there is no existing limit on the number of shares to be issued and no stated value per share. In *Burns,* the money equivalent of the price for the 25% of the stock allegedly orally agreed to be transferred in exchange for services was clearly ascertainable. The agreed value for 24% of the stock was $12,000; therefore, the ascertainable monetary value of the services to be exchanged for 25% of the stock was $12,500. In the case *sub judice,* however, there was no way to determine the monetary equivalent of the services to be performed as the price for 25% of the stock of the corporation to be formed. This distinction is critical because, under Maryland law, stock cannot be issued by a corporation for services or any other consideration other than money without a declaration of the actual value of such consideration. Md.Code Ann., Corp. & Ass'ns § 2–203. Section 8–319 of the Commercial Law Article, therefore, does not appear to have been intended to apply to an agreement to pay for services of an undetermined value with a percentage of stock of a corporation to be formed at a later date.

Because we conclude that § 8–319 of the Commercial Code is inapplicable to the employment contract at issue and reverse the judgment appealed from on that basis, we need not consider appellant's alternative arguments. We do not reach the issue of whether the UCC provisions were satisfied or whether the use of equipment and machinery owned by appellant without charge or rental fee removes the case from the statute of frauds under the doctrine of part performance.

JUDGEMENT REVERSED.

COSTS TO BE PAID BY APPELLEE.