Wood Byrd, and Bacadam, Inc. (hereinafter jointly referred to as "the defendants"), appeal from the trial court's judgment on a $1,350,000 jury verdict in favor of Mark Bentley. We affirm.
On March 9, 1999, Bentley sued the defendants seeking to recover damages on claims of fraud and breach of contract. Bentley, who had been employed as manager of Bacadam, which was owned by Byrd, alleged that an oral contract of employment existed between him and the defendants in which he was to receive an 8 percent commission from his sales[1] and a 30 percent ownership interest in Bacadam in the event that he met certain goals in increasing Bacadam's business. He also asserted that the parties had agreed that, in order to expand Bacadam's business, he would receive a 50 percent ownership interest in any company he located for Bacadam *Page 234 
to purchase, and that he had arranged for the purchase by Bacadam of another company, Reach Advertising. Bentley further alleged that Byrd sold all the assets of Bacadam and purchased Reach Advertising, but that Bentley never received an ownership interest in Bacadam or Reach Advertising.
On December 30, 1999, the defendants filed an answer denying Bentley's claims and asserting counterclaims alleging breach of contract, fraud, and violations of the Alabama Trade Secrets Act, § 8-27-1 et seq., Ala. Code 1975, based upon their allegations that Bentley had not devoted his full attention to Bacadam as agreed and that he had engaged in business in competition with Bacadam. After the completion of discovery, a jury trial began on August 6, 2001. On August 7, 2001, at the close of Bentley's case-in-chief, the defendants filed a motion for a judgment as a matter of law, with a supporting memorandum. The trial court took the defendants' motion under advisement and allowed the defendants to present their case. At the close of the defendants' case, Bentley filed a motion for a judgment as a matter of law in regard to the defendants' counterclaims; the trial court granted that motion. The defendants also renewed their motion for a judgment as a matter of law, and the trial court denied it as to Bentley's breach-of-contract claim but reserved ruling on it as to Bentley's fraud claim. Following Bentley's presentation of rebuttal testimony, he voluntarily dismissed his fraud claim. Thus, the only claim presented to the jury was Bentley's breach-of-contract claim. On August 9, 2001, the jury returned the following verdict:
 "We, the jury, find in favor of Plaintiff, Mark Bentley, and against the Defendants, Wood Byrd and Bacadam, Inc., and assess the Plaintiff's damages at One Million Three Hundred Fifty Thousand dollars ($1,350,000.00)."
On that same day, the trial court entered a judgment on the jury's verdict.
On September 5, 2001, the defendants renewed their motion for a judgment as a matter of law, and also filed, in the alternative, a motion for a new trial; Bentley filed a response in opposition on September 24, 2001. On September 28, 2001, the defendants filed a memorandum in support of their postjudgment motion; Bentley filed a supplemental response on October 10, 2001. On October 22, 2001, the trial court entered an order that stated, in pertinent part:
 "THIS CAUSE was heard on the Defendants['] Motion for Judgment [as a matter of law] and/or Motion for New Trial. On August 9, 2001, the jury in this cause returned a verdict in favor of [Bentley] and against the Defendant[s] in the sum of One Million Three Hundred Fifty Thousand and 00/100 Dollars ($1,350,000.00). The evidence submitted by [Bentley] is that the parties entered into an agreement whereby [Bentley] would leave his job in Huntsville and manage Bacadam, Inc., which was owned by [Byrd]. The consideration for [Bentley's] employment would be a salary and in addition the transfer of a thirty (30%) percent interest in the company conditioned upon [Bentley's] meeting certain financial and growth goals. [Bentley's] evidence was that although he met those goals, the Defendant refused to transfer a thirty (30%) percent interest in the company to [Bentley] and, in fact, sold the company to another corporation for the approximate sum of Six Million Dollars ($6,000,000.00), without the knowledge or consent of [Bentley]. [Byrd] emphatically denies that he ever agreed to transfer an interest in Bacadam, Inc., to [Bentley] and further, that such an agreement for the transfer *Page 235 
of stock would be unenforceable under the Statute of Frauds because it is undisputed that the alleged agreement was never reduced to writing. At the conclusion of [Bentley's] evidence and at [the] conclusion of all of the evidence, the Defendant[s] made an appropriate motion for a judgment as a matter of law which motion was overruled.
 "Although disputed, there was sufficient evidence which, if believed by the jury, would support a judgment in the amount of the verdict. The evidence offered by [Bentley] that he fully performed his part of the agreement in that he met the financial and growth goals that would entitle him to a transfer of a thirty (30%) percent interest in Bacadam, Inc., was apparently believed by the jury and reflected in its verdict. [Bentley's] full performance of the oral agreement with the Defendant[s] took the contract out of the Statute of Frauds and was, accordingly, enforceable. Ingram v. Omelet Shoppe, Inc., 388 So.2d 190
(Ala. 1980). The Defendant[s] also argue that an employment contract which was not reduced to writing is unenforceable and further, that the alleged contract was a sale of securities which was also unenforceable as being in violation of the Statute of Frauds. The Court has not been directed to an Alabama case specifically on this point[;] however, other jurisdictions have addressed similar issues. In Hiller v. Franklin Mint, Inc., 485 F.2d 48 [(3d Cir. 1973)], the [United States Court of Appeals for the Third Circuit] held that the transfers of securities pursuant to an employment contract did not constitute `sales of securities' within the purview of the Pennsylvania Statute of Frauds dealing with the sale of securities. The Supreme Court of Pennsylvania held, in a case factually similar to the instant case, that an oral contract for an employee to quit his job and work for a new employer in exchange for an annual salary plus ten (10%) percent of its stock was not a sale of securities and was enforceable. In Jones v. Cecil Sand Gravel, Inc., [97 Md. App. 87,] 627 A.2d 60 [(1993)], the Court of Special Appeals of Maryland found that the Statute of Frauds requiring contracts for sale of securities to be in writing did not apply to oral employment contracts agreeing to exchange of stock for services. Where the only consideration for the stock was acceptance of employment, an oral contract is not prohibited by the section of the Statute of Frauds providing that a contract for sale of securities is not enforceable unless there is some writing signed by [the] party against whom enforcement is sought Bowers Steel, Inc. v. DeBrooke, 557 S.W.2d 369 [(Tex.Civ.App. 1977)]. Finally, the Court of Appeal[s] of Georgia held that the Statute of Frauds requirement that there be a writing before a contract was enforceable did not apply to an alleged arrangement under which employer was to transfer corporate stock to employee in consideration for services rendered. Thompson v. Kohl, [216 Ga. App. 148,] 453 S.E.2d 485 [(1994)].
 "In this case there was substantial evidence presented from which the Jury could conclude that there was an employment contract between [Bentley] and the Defendant[s] for which the consideration was the exchange or transfer of stock in Bacadam, Inc.
 "Accordingly, the Defendants' Motion for Judgment [as a matter of law] and/or Motion for New Trial is OVERRULED."
On November 28, 2001, the defendants filed a notice of appeal.
The record shows that at trial, Bentley testified that the agreement between him *Page 236 
and the defendants was that, in exchange for his increasing Bacadam's profits, he would receive a 30 percent ownership interest in the company, the value of which was to be determined as of the date he began work for Bacadam and was to be paid for by the increased profits he generated. He further testified that when he began work, Bacadam was receiving monthly revenues of $35,000-$36,000 and that Byrd set a goal for Bentley to increase that amount to $70,000 per month. Bentley stated that the $70,000 goal was reached, and in some months even surpassed.
Bentley's testimony regarding his employment agreement with the defendants was supported by the testimony of Dwight Jennings. Jennings was Bentley's former employer and an acquaintance of Byrd's. Jennings testified that Byrd had telephoned him in an effort to find someone to hire as manager of Bacadam. Jennings recommended Bentley and arranged a meeting between them, but told Byrd that Bentley would most likely require an ownership interest as part of his compensation for employment. Jennings further testified as follows:
 "Q. After the meeting took place, did you have a conversation with Wood Byrd —
"A. Yes.
 "Q. — about how the meeting went. And if you would tell us what he said in this conversation.
 "A. He was very impressed with Mark [Bentley]. He was very happy that he had had the conversation with Mark. He said that he thought they either had a deal or could work out a deal; that Mark had wanted 50 percent ownership in the company, but he thought that they could work it out somewhere in the range of 30 percent; that he was going to pay Mark a salary; if Mark got the job done, he would pay him a bonus, and that bonus would go towards helping him buy some ownership in the company."
Jennings also testified that after subsequent conversations with Bentley relating to Byrd's failure to offer him an ownership interest, he spoke to Byrd. Jennings testified that Byrd confirmed the agreement, saying that he was close to giving Bentley his ownership interest. It is undisputed that Bentley never received an ownership interest in Bacadam although he worked for that company continuously from the time of his employment in early 1994 until the company was sold in November 1998.
After Bentley learned of Byrd's sale of Bacadam in 1998, he tape-recorded a conversation between him and Byrd on a microcassette recorder. A copy of that microcassette recording was transferred to a larger cassette so that, as Bentley's attorney stated at trial, it could be more fully amplified for the jury; the copy was played for the jury and admitted into evidence. A transcript of that recording was also presented to the jury. The defendants objected to the admission of the copy of the tape recording, and prior to its being played to the jury, the trial court and attorneys listened to the tape recording and compared it to the transcript, outside the presence of the jury. The defendants' attorney questioned certain portions of the tape recording in which he thought some conversation was missing, and the trial court allowed the defendants the opportunity to have an expert witness testify concerning alleged "discontinuities" on the tape recording. That expert witness testified that he and an assistant marked 12 places on the recording at which they believed a discontinuity existed. During the expert's testimony, a compact disc or "CD" recording the expert had made from *Page 237 
the tape recording was also played for the jury and admitted into evidence.
On appeal, the defendants argue (1) that an oral contract for the sale of securities pursuant to an employment contract violates the Statute of Frauds; (2) that Bentley failed to present sufficient evidence to establish that a contract existed between him and the defendants; and (3) that the duplicate tape recording should not have been admitted into evidence when the original was available. No issue concerning the amount of the verdict is raised by the defendants in their brief, except for the single statement that, "Assuming [Bentley's] version of the contract [is] correct, then he would only be entitled to $519,000, or 30% of the difference between the cost of the company in 1993 and the sales price of [$]5.6 million." However, the defendants' postjudgment motion asserted only that Bentley was not entitled to recover at all and raised no issue of excessive or unproven damages.
 I. Statute of Frauds
The defendants first argue that an oral contract for the sale of securities pursuant to an employment contract violates the Statute of Frauds. As was the case with their presentation to the trial court, they have not cited any Alabama case on point in their brief to this Court. They state in that brief that "[t]he only real issue is whether in fact the transaction described by [Bentley] can be properly described as a `sale' of securities." The defendants assert that if we were to consider the alleged agreement to employ Bentley solely as a "sale of securities," Bentley's breach-of-contract claim would be barred by the Statute of Frauds.
In 1994, when the alleged agreement took place, § 7-8-319, Ala. Code 1975, read as follows:
 "A contract for the sale of securities is not enforceable by way of action or defense unless:
 "(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or
 "(b) Delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or
 "(c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within 10 days after its receipt; or
 "(d) The party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities as a defined or stated price."
Section 7-8-319 was repealed on January 1, 1997, and was replaced by § 7-8-113, Ala. Code 1975, which states:
 "A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making."
However, the Alabama Comment to § 7-8-113 explains that this section is applicable only to transactions in the organized securities market, e.g., the sale or *Page 238 
purchase of securities through a stock exchange or the over-the-counter securities market, and that all other agreements are subject to Alabama's general Statute of Frauds, § 8-9-2, Ala. Code 1975. Section 8-9-2 was also amended January 1, 1997, to provide, in pertinent part:
 "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
". . . .
 "(8) Notwithstanding Section 7-8-113, every agreement for the sale or purchase of securities other than through the facilities of a national stock exchange or of the over-the-counter securities market."
The evidence supports an inference that part of Bentley's employment contract with the defendants was that, in consideration of Bentley's acceptance of employment and upon his increasing Bacadam's monthly revenues as its manager, Byrd would transfer an ownership interest in Bacadam to Bentley. Whether this type of arrangement constitutes a "sale of securities" under the Statute of Frauds has not been addressed in this State; we therefore consider how other jurisdictions have answered it.
In Hiller v. Franklin Mint, Inc., 485 F.2d 48 (3d Cir. 1973), the United States Court of Appeals for the Third Circuit, relying onBaldassarre v. Singer, 444 Pa. 100, 282 A.2d 262 (1971), held that a similar agreement was a contract of employment and not a contract for the sale of securities in violation of New York's or Pennsylvania's Statute of Frauds. In Hiller, as is the case here, if the agreement had been considered a "sale of securities," it would have been in violation of those Statutes of Frauds. In Baldassarre, pursuant to an oral contract, two chemists agreed to accept employment with a company, each receiving an annual salary of $13,000 and an equal division of 10 percent of the stock of the company, i.e., each would receive 5 percent of the stock. The company and its owner appealed from a lower court's order requiring the ownership interest to be transferred to the chemists, arguing, in part, that the agreement was a "sale of securities," and was in violation of the Statute of Frauds. The Supreme Court of Pennsylvania stated:
 "By its own terms, § 8-319 [of the Uniform Commercial Code] only applies to `a contract for the sale of securities.' We are not convinced that this section is applicable to the transaction in question. Although `sale of securities' is nowhere defined, § 2-106 defines `sale' as: `A "sale" consists in the passing of title from the seller to the buyer for a price.' There is no `price' for stock transferred pursuant to an employment contract. The only consideration is the employment itself. If appellants are correct that an employment contract is a sale for purposes of § 8-319, the Uniform Commercial Code's statute of frauds on securities, then the two chemists, by leaving their previous employment and working for Rare Metals, have made `payment' for the stock, and thus are entitled to enforce their oral contract under the terms of § 8-319(b). However, we do not believe that such an awkward use of language is necessary. We believe it much more reasonable to state that the contract in question is simply not a contract of sale."
444 Pa. at 103, 282 A.2d at 264.
In Bowers Steel, Inc. v. DeBrooke, 557 S.W.2d 369 (Tex.Civ.App. 1977), an employee sued his employing corporation alleging *Page 239 
that it had breached an oral contract of employment by failing to transfer 20 percent of the stock in the corporation to him. A jury returned a verdict in favor of the employee. On appeal, the Texas Court of Civil Appeals stated, in pertinent part:
 "It is noted that the appellant treats the oral contract as requiring future payment by appellee of the stock, while appellee claims that he is entitled to the stock as consideration for his accepting employment with appellant. The question was determined by the jury adversely to appellant, and, therefore, we hold that the prohibition of § 8.319 does not apply. By the terms of § 8.319(2), the prohibition does not apply where payment has been made. Baldassarre v. Singer, 444 Pa. 100, 282 A.2d 262
(1971)."
557 S.W.2d at 374.
In Jones v. Cecil Sand Gravel, Inc., 97 Md. App. 87, 627 A.2d 60
(1993), the Maryland Court of Special Appeals also addressed this issue, and after setting out the same language quoted earlier from Baldassarre, stated further:
 "Several courts have employed the same approach and treated such transactions as contracts for employment rather than as contracts for the sale of stock. See McDermott v. Russell, 523 F. Supp. 347, 350-51
(E.D.Pa. 1981) (court refused to dismiss action based on evidence of an oral contract for the delivery of stock in exchange for services); Hiller v. Franklin Mint, Inc., 485 F.2d 48, 51 (3d Cir. 1973) (arrangement treated as contract for employment); Spinney v. Hill, 81 Minn. 316, 84 N.W. 116 (1900) (in an action to recover damages and the par value of promised stock the court rejected defendant's argument that the compensation in stock shares was a sale of chattel). In Spinney v. Hill, 81 Minn. 316, 84 N.W. 116
(1900), the Supreme Court of Minnesota decided that '[a]n agreement to pay for one's services in goods, chattels, or choses in action is not a sale, within the letter or the spirit of the statute of frauds. It is a mere agreement as to the method of compensation.' Id. 84 N.W. at 117. We are compelled by the forceful logic of this statement. Other courts have construed `payment' to include the act made in reliance on the contract. See Cumming v. Johnson, 616 F.2d 1069, 1073
n. 4 (9th Cir. 1979)."
97 Md. App. at 92-93, 627 A.2d at 62. See also Thompson v. Kohl,216 Ga. App. 148, 151, 453 S.E.2d 485, 488 (1994) ("Although the question is debatable, we hold that an oral agreement by an employer to transfer corporate stock to an employee for a non-monetary consideration is not a `sale' within the meaning of UCC § 8-319.").
The Bowers Steel court distinguished two cases cited by the defendants, Mildfelt v. Lair, 221 Kan. 557, 561 P.2d 805 (1977), andScarpinato v. National Patent Development Corp., 75 Misc.2d 94,347 N.Y.S.2d 623 (Sup.Ct. 1973), by stating that in those two cases "the oral promise was an option to purchase in the future for a price." 557 S.W.2d at 374. As was the case in Bowers Steel, the evidence here supports an inference, which was accepted by the jury, that in consideration for his acceptance of employment and increasing Bacadam's monthly revenues, Bentley would receive a 30 percent ownership in the company. Accordingly, this case also is distinguishable from those situations in which an employee is offered an "option to purchase [stock] in the future for a price."
The Jones court discussed Burns v. Gould, 172 Conn. 210, 374 A.2d 193
(1977), a case also cited by the defendants to this Court, stating as follows:
 "In Burns v. Gould, . . . the Supreme Court of Connecticut found the Baldassarre *Page 240 
court's rationale regarding the price term to be unpersuasive. The Connecticut court treated `price' as `something which one ordinarily accepts voluntarily in exchange for something else . . . the consideration given for the purchase of a thing,' quoting Black's Law Dictionary (Rev. 4th Ed.), and concluded that the plaintiff's action met the requirements of this definition. In Burns, the plaintiff, who had joined with the defendant in developing a convalescent home and forming a corporation for it, received 25% of the stock of the corporation with an option to buy an additional 24% of the stock for $12,000. The defendant later formed another corporation to develop a nursing home, but none of its stock was issued to the plaintiff. The plaintiff alleged that the parties had an oral agreement concerning the second corporation, in which plaintiff was to receive for his services in developing the project the same percentage of stock ownership — 25% immediately with an option to purchase 24% of the stock for $12,000. The Connecticut appellate court, reversing the trial court, held that the statute of frauds section of the UCC was applicable to the transaction. The court apportioned plaintiff's recovery based on the amount of stock actually paid for by plaintiff through his services.
 "In Burns, the court analogized the treatment of contracts for the sale of goods in exchange for a price paid in realty or goods under Article 2 (Sale of Goods) of the UCC to the employment contract situation. We believe that a contract for employment is substantially different from a contract in which the price is paid in realty or goods."
97 Md. App. at 93-94, 627 A.2d at 63. Other cases cited by the defendants to support their argument that the agreement between Bentley and the defendants was a "sale of securities" are Bentley v. ASM Communications,Inc., No. 91 CIV. 0086 (S.D.N.Y., June 11, 1991) (not published in F. Supp.), and Cooling Tower Erectors, Inc. v. Williams, No. 81 C 6678 (N.D.Ill., October 1, 1984) (not published in F. Supp.).
While Bentley and Cooling Tower Erectors, both unpublished opinions by federal district courts, do support the defendants' argument, we are most persuaded by those jurisdictions that view similar agreements not as "sales of securities," but as employment contracts, and we conclude that the agreement between Bentley and the defendants was an employment contract and was not subject to § 8-9-2, Ala. Code 1975, Alabama's Statute of Frauds.
 II. Sufficient Evidence to Support a Contract
The defendants further argue that there was not sufficient evidence to prove that a contract existed between Bentley and the defendants. The jury's verdict and the trial court's denial of the defendants' postjudgment motion creates a strong inference that there was sufficient evidence to establish the existence of a contract. This Court has stated:
 "A jury verdict carries a strong presumption of correctness, and no ground for a motion for new trial will be more carefully scrutinized or more rigidly limited than an assertion that the verdict is contrary to the weight of the evidence. The presumption in favor of the verdict is strengthened when the circuit court denies a motion for a new trial. On appeal, this Court will not reverse the denial of a motion for a new trial unless, after allowing all reasonable inferences in favor of the verdict, it concludes that the weight and preponderance of the evidence is so decidedly against the verdict as to convince the Court that the verdict is plainly and palpably wrong and unjust. Delchamps, Inc. v. Larry, *Page 241 613 So.2d 1235, 1239 (Ala. 1992); S. S. Kresge Co. v. Ruby, 348 So.2d 484, 488-89 (Ala. 1977); Merchants Bank v. Cotton, 289 Ala. 606, 609, 269 So.2d 875, 878
(1972)."
Reed v. Boyd, 642 So.2d 448, 450 (Ala. 1994).
As previously discussed, testimony was presented at trial by Bentley and Jennings from which the jury could have reasonably inferred that a contract existed between Bentley and the defendants. Accordingly, we conclude that there was sufficient evidence to support the jury's verdict and the trial court's denial of the defendants' postjudgment motion.
 III. Admissibility of Duplicate Tape Recording
The defendants' last argument is that a duplicate tape recording should not be admissible when the original recording is available. As subissues of their argument, the defendants argue that the admission of the duplicate tape recording violated the best evidence rule and that the recording was not properly authenticated. In their brief to this Court, the defendants state that the original tape recording was not admitted into evidence. However, our review of the record reveals that the original tape recording was admitted into evidence. The record contains the following dialogue between the trial court and Bentley's attorney:
 "THE COURT: Now, you offer the tape, which is Number 1 and the transcript, which is number 1A.
 "[Bentley's attorney]: Well, I want to offer the small tape as number 1. [The record reflects that Exhibit 1 was admitted into evidence at this point.]
 "THE COURT: Do it this way, then, rather than that. Do the small tape as 1.
"[Bentley's attorney]: All right.
"THE COURT: The large tape as 2, not 1A.
"[Bentley's attorney]: All right.
"THE COURT: And you want the transcript as 3?
 "[Bentley's attorney]: That will be fine and better. [The record next reflects that Exhibits 2 and 3 were admitted into evidence at this point.]"
The defendants also offered a C.D. made by their expert witness from the duplicate tape; the offering of the C.D. into evidence appears in the record as follows:
 "THE COURT: Well, we've got these exhibits you're offering Robert [defendants' attorney].
"[Defendants' attorney]: Yes, sir.
"THE COURT: You're offering 2.
"[Defendants' attorney]: Yes, sir. I offered 1, 2, and 3.
"THE COURT: What was 3?
 "[Defendants' attorney]: I thought the C.D. was — well, I said 3 when I was talking about the charts. My apologies.
"THE COURT: It's just two.
"[Defendants' attorney]: 1 and 2, yes, sir, the entire 1.
"THE COURT: The C.D. is in. . . ."
The record also shows that the trial court delivered all exhibits to the jury for its deliberation, and among the exhibits included in that record is the original microcassette tape recording, marked as "Plaintiff's Exhibit 1." Also, the defendants acknowledge in their brief to this Court that a portion of the original recording was played for the jury; they state, however, that "[o]nly a portion was played, and that was at least one day after there was an objection by [Defendants'] Counsel concerning certain discontinuities on the tape." Obviously, once the original microcassette recording was admitted into evidence as plaintiff's exhibit *Page 242 
1, and played partially for the jury, there was nothing to prevent the defendants during trial, or the jury during its deliberations, from playing it in its entirety. The jury had before it as trial exhibits three different recordings — the original microcassette recording, the larger cassette that had been copied from the microcassette recording, and the C.D. made by the defendants' expert witness — and a transcription of the contents of the larger cassette recording that it could compare to any of the recordings for inconsistencies and "discontinuities" and from which it could assign the appropriate weight to give the recordings, as it saw fit. See, e.g., Avery v. State,589 So.2d 1313, 1315 (Ala.Crim.App. 1991) ("The fact that parts of a tape recording were inaudible would not affect the admissibility of the recording but the weight which the jury places on the evidence."). Thus, we conclude that there is no basis for the defendants' argument that the original recording was not admitted into evidence.
The defendants argue that the admission of the duplicate recording violates the best evidence rule. However, our review of the record shows that the defendants failed to object to the admissibility of the duplicate recording on that ground. The only mention of an objection based on the best evidence rule was to the admissibility of the transcript of the recording. Moreover, Alabama's best evidence rule, Rule 1002, Ala. R. Evid., is not applicable to tape recordings. The Advisory Committee's notes to Rule 1001(1), Ala. R. Evid., which defines "writings," state, in pertinent part:
 "Alabama's best evidence rule continues applicable to writings only. Adoption of this rule is a rejection of the corresponding federal rule, which expands the best evidence principle to cover recordings and photographs. See Fed.R.Evid. 1001(1). Chattels generally remain outside the scope of the best evidence principle. See Jones v. Pizza Boy, Oxford, Inc., 387 So.2d 819 (Ala. 1980). Tape recordings, for example, present no best evidence issue. O'Daniel v. O'Daniel, 515 So.2d 1248 (Ala.Civ.App.), rev'd, 515 So.2d 1250 (Ala. 1987) (holding re-recording of taped conversation admissible without accounting for unavailability of the original tape). See C. Gamble, McElroy's Alabama Evidence § 212.01 (4th ed. 1991)."
See also Ex parte O'Daniel, 515 So.2d 1250 (Ala. 1987), and Withee v.State, 728 So.2d 684 (Ala.Crim.App. 1998).
The defendants further contend that Bentley failed to properly authenticate the recording. Before the recording was played to the jury, Bentley testified as to the identification of the voices on the tape. The trial court then further questioned Bentley as follows:
 "THE COURT: Mr. Bentley, did you make this recording yourself?
"THE WITNESS: Yes, sir.
 "THE COURT: After you made the recording, what did you do with the tape?
"THE WITNESS: I took it to my attorney's office.
"THE COURT: That attorney being who?
"THE WITNESS: That being Buck —
"[Bentley's attorney]: — Watson.
 "THE WITNESS: — Watson. I couldn't think of it. Buck Watson in Huntsville, Alabama.
"THE COURT: Do you know what he did with the tape?
 "THE WITNESS: He told me that he transcribed it. We played it in his office.
"THE COURT: You did?
"THE WITNESS: Yes, sir. *Page 243 
 "THE COURT: What happened to the tape after you gave it to Mr. Watson, if you know.
 "THE WITNESS: To the best of my knowledge, Mr. Watson wanted to — I don't know what the term is, but wanted to enjoin [sic] a Birmingham law firm, and that was Mr. Dauphin [Bentley's attorney]. And they forwarded the tape here and the transcript.
"THE COURT: Are you going to be able to tie up the tape?
"[Bentley's attorney]: Yes, sir.
 "THE COURT: All right. With that condition, what I'm going to do, ladies and gentlemen, is let you hear the tape. And there's been a transcription made by Mr. Dauphin's office that reportedly reflects what you will hear on the tape.
 "Now we've been listening to the tape and looking at the transcript. You and you alone, though, are the sole and exclusive judges of what you hear on the tape and what you see on the transcription and whether or not they are one and the same. This goes — and you will be the judges as to the credibility and to what weight you want to give this testimony. But I'm going to give you ladies and gentlemen an opportunity to hear it. So go ahead. Pass out your transcripts."
Counsel for the defendants then renewed a previous objection to the admission of the tape recording into evidence. Bentley further testified, in response to questions from his attorney, as follows:
 "Q. . . . Mr. Bentley, you have listened to the tape and listened to the — and compared it to the transcription.
"A. Yes.
 "Q. And is both the tape and the transcription an accurate recording of the conversation that you had with Mr. Byrd?
"A. It's an exact recording."
Rule 901, Ala. R. Evid., deals with the "Requirement of Authentication or Identification." Rule 901(a) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The Advisory Committee's notes further state, in pertinent part:
 "The question of authenticity or proper identification is, in the first instance, for the trial judge as a preliminary matter. See Ala. R. Evid. 104(a). The required foundational showing must consist of evidence `sufficient to support a finding that the matter in question is what its proponent claims.' The evidence of authentication or identification, as under prior Alabama practice, does not have to be conclusive or overwhelming; rather it must be strong enough for the question to go to the jury. Any weaknesses in the foundational showing, insufficient to call for exclusion, go to the weight that the trier of fact is to give the evidence. See Tidwell v. State, 496 So.2d 109
(Ala.Crim.App. 1986)."
Under the circumstances of this case, we conclude that the required foundational showing was made to allow for the proper admission of the recording. Any weakness in that showing was subject to the jury's determination of the evidentiary weight to give the recording. Tidwellv. State, 496 So.2d 109 (Ala.Crim.App. 1986).
For the foregoing reasons, we affirm the trial court's judgment.
AFFIRMED.
Moore, C.J., and See, Brown, and Stuart, JJ., concur.
[1] Apparently Bentley was paid the eight percent commission. He makes no argument on appeal relating to that part of the agreement. *Page 244