644 A.2d 529

**CECIL SAND & GRAVEL, INC.**

v.

**Michael K. JONES.**

**No. 108, Sept. Term, 1993.**

Court of Appeals of Maryland.

July 19, 1994.

J. Richard Margulies, Rockville (Leonard A. Sacks also on brief, Rockville, for petitioner.

Michael J. Scibinico, II (Jodibauer, Lidums & Scibinico, all on brief), Elkton, for respondent.

Argued before MURPHY, C.J. and RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and CHARLES E. ORTH, Jr.,* Judge of the Court of Appeals (retired) Specially Assigned.

RODOWSKY, Judge.

This action seeks to enforce an oral contract that allegedly was made between persons interested in the proposed business of a corporation to be formed, and under which twenty-five percent of the stock would be issued to the plaintiff in consideration of the plaintiff's employment services, or of the corporation's use of certain equipment owned by the plaintiff, or of both. At the close of the plaintiff's case the circuit court entered judgment on motion for the defendant, concluding that the statute of frauds of the Investment Securities Article of the Uniform Commercial Code barred enforcement of the alleged contract. The Court of Special Appeals reversed, holding that the investment securities statute of frauds does not apply to employment contracts. *Jones v. Cecil Sand & Gravel, Inc.*, 97 Md.App. 87, 627 A.2d 60 (1993). The defendant sought, and we granted, certiorari. We shall affirm the judgment of the Court of Special Appeals, but we rest our decision on compliance with the statute by the plaintiff's performance.

The plaintiff, and respondent in this Court, is Michael K. Jones (Jones), who since 1966 has worked in management positions in the sand and gravel mining industry. In 1985 Jones, as the proprietor, had been mining a site in the Crofton

---

* Orth, J., participated in the hearing of this case and in the conference in regard to its decision but died prior to the adoption of the opinion by the Court.

area. Business could have been better. He had not located a sufficient source of material to run the operation, and he owed money to the Internal Revenue Service in an amount later fixed at approximately $103,000.

Also in 1985 William Franey (Franey), a businessman whose office was in Capitol Heights, Prince George's County, wanted to explore the feasibility of mining and selling sand and gravel from a Cecil County site of approximately 225 acres (the Site) where a prior operator had discontinued a similar business. In April 1985 David E. Cloud (Cloud), who was an employee of a company in which Franey was interested and with whom Jones was acquainted, arranged for Jones to inspect the Site in order to advise Franey. After a second, more detailed inspection in May, Jones concluded that the Site had potential. Jones asked Cloud to communicate to Franey Jones's interest in becoming involved in the project.

Based on the inferences most favorable to Jones, who was the only witness to testify at trial, matters proceeded in the following fashion.[1] Jones met with Franey in Capitol Heights in mid-May and was asked to prepare in writing a plan for rehabilitating the processing plant on the Site. Jones prepared that report and furnished it to Franey at one of a number of meetings between them that took place in late May and early June.

At one of these meetings Jones and Franey had lunch with John Driggs (Driggs), a businessman in Capitol Heights whose office was one block from that of Franey. Driggs was to be an investor in the Cecil County venture. When Jones told Driggs of Jones's interest in an equity position, Driggs advised that whatever Franey and Jones "worked out would be fine with" Driggs.

Immediately following that luncheon, Jones and Franey went back to Franey's office and "really got into some specif-

---

1. The case was tried non-jury. Although a judge trying a civil action without a jury may determine the facts at the end of the plaintiff's case when ruling on a motion for judgment under Maryland Rule 2–519(b), the court in the instant matter ruled solely as a matter of law.

ics about the formation of the company." Jones had advised Franey that complete rehabilitation of the plant at the Site would cost approximately $250,000. Jones proposed that he would use his equipment from Crofton in the Cecil County operation. In lieu of the venture paying rent to Jones for the use of that equipment, Jones would contribute the use of the equipment for twenty-five percent of the stock in the corporation to be formed. This arrangement would continue until "such time as the company got on its feet, where it could start generating funds to purchase [Jones's] equipment." Franey replied that "that sounded fair enough."

Jones agreed with Franey to get the Site operational and, inferentially, to oversee production. Around the fourth of July Jones was furnished with the keys to the processing plant on the Site and with a $5,000 check drawn on one of Franey's corporations. Jones opened a bank account in Cecil County, using his own name pending formation of the corporation, and Jones began hiring workers. He was also furnished with a leased truck for the commute between his home in Prince George's County and the Site.

The petitioner, and defendant in the circuit court, Cecil Sand & Gravel, Inc. (the Corporation), was formed as a Maryland close corporation on or about July 11, 1985, although Jones never saw the corporate charter until December 1988. The incorporator was one Lewis F. Morse (Morse). His letter of transmittal of the articles of incorporation to the State Department of Assessments and Taxation is on the letterhead of Construction Management, Inc., the address of which is in Capitol Heights, and for which Morse signed as general counsel.

The charter of the Corporation authorizes 5,000 shares of $1.00 par, common stock. Jones is named as resident agent of the Corporation. His address is stated to be in Port Deposit, Cecil County. The same address is designated as that of the principal office of the Corporation.

Of critical significance to the issue in this case is Paragraph SEVENTH of the charter. It reads:

"After the completion of the organizational meeting of the director and the issuance of one or more shares of stock of the Corporation, the Corporation shall have no Board of Directors. Until such time, the Corporation shall have one director, whose name is Michael Jones."

Jones testified that he had no specific salary arrangement with Franey. Jones advised bookkeepers in Franey's Capitol Heights office that Jones wanted to clear $500 per week, and he was paid a gross weekly salary of some $800. Initially Jones hired two laborers, then an office employee, and later a loader operator, without prior consultation with Franey. Jones also applied to the Maryland Department of Natural Resources for a surface mine license. He signed the application as president and listed himself, Franey, and Cloud as directors.

Jones went about the work of cleaning up the Site and rehabilitating the processing plant.[2] Jones transferred from Crofton to the Site equipment comprising both plant equipment and rolling stock. The rolling stock consisted principally of a wheel loader and of a bulldozer. The plant equipment was more or less affixed to the realty. Jones testified that the fair rental value of the bulldozer was $8,000 per month, of the loader, $6,000 per month, and of the plant equipment, $6,200 per month. For the periods beginning when the respective classes of equipment were first used, rent free, on the Site and ending in March 1988, after which the Corporation began paying rent for the equipment under a written lease, the total value of the Corporation's use was, according to Jones, $510,-000.

---

**2.** The record does not reveal with any precision the rights of the Corporation in the Site. It appears that the land, or the right to mine the land, was owned by one partnership, and that a separate partnership previously owned the abandoned equipment and plant, as well as rights derived from the first-mentioned partnership to exploit the minerals. The inference is that rights were acquired by the Corporation from one or both of these partnerships. Both of these partnerships appear to be otherwise independent of the parties and persons involved in the instant matter.

The Corporation processed the first material through the rehabilitated plant in March 1987. The Corporation had gross sales of approximately $1 million for the tax year ending March 31, 1988, on which, Jones testified, the profit was $25,000. He testified that gross sales for 1989 were almost $2 million.

In January 1986, Jones's tax liabilities caught up with him. The Internal Revenue Service seized, and sold at auction, several pieces of equipment that Jones had had at Crofton. The IRS also levied on Jones's salary from the Corporation. He eventually agreed with the IRS to pay $325 per week on the tax obligation, leaving Jones $175 in take-home pay. Jones's wife obtained employment as a public school teacher. During this period Jones sought to sell to the Corporation his equipment on the Site. Eventually, by a written equipment lease executed April 1, 1988, the Corporation leased Jones's equipment in use at the Site for $3,900 per month for a term of thirty-six months ending March 31, 1991. Upon termination of the lease the Corporation had the option to purchase all of the equipment for $10. The lessor named under the lease is Jones's wife, a stratagem intended to protect both the rental payments and the leased equipment from possible IRS seizure.[3]

While Jones was concentrating on the Corporation's operations in Cecil County, he had little direct contact with Franey. From time to time Jones would inquire of Franey or others in Franey's employ about Jones's stock in the Corporation, but he was never given a definitive answer. For example, Jones was told during the period of his IRS troubles that he should not take his stock at that time because the IRS would seize it.

When Jones first saw the articles of incorporation for the Corporation in December 1988, it prompted a "lively discus-

---

3. It is inferable that Jones's agreement to make installment payments to the IRS included a forbearance by the IRS of more vigorous collection efforts. If that is so, then the risk of IRS seizure of the rent and equipment was contingent on default in the installment/forbearance agreement.

sion" between Jones and one Blaine Brownlow (Brownlow) while the latter was visiting the Site. Jones understood Brownlow to be a vice president of the Corporation.[4] In that discussion Jones insisted that the matter of his stock be settled. By a letter of December 22, 1988, Brownlow wrote to Jones, enclosing a check for $2,000 payable to Jones's wife, and advising in part:

"[W]e are completing the November financial data, which will be used for projecting [the Corporation's] year end position and will be the basis for clarifying your personal position with respect to equity, profit sharing, etc."

In February 1989 Jones received in the mail, inferentially from Franey's office, a copy of a check made payable to, and of an order form directed to, a company in New York for a stock record book and stock certificates for the Corporation.

At some unspecified time thereafter, Jones consulted counsel and concluded "that the whole thing was not on the up and up."[5] In May 1989, Brownlow countermanded an order for a piece of equipment that Jones had placed with a dealer on behalf of the Corporation. On June 26 Franey came to the Site and told Jones that he was fired. Jones told Franey that Franey should read the charter of the Corporation. Franey, on the spot, wrote a longhand letter to Jones, signing it as "director." The letter stated that Jones's employment as president of the Corporation was thereby terminated and that "[t]his action has been approved by a special meeting of the board of directors held on June 24, 1989."

Jones testified that he never "participated in any form in an organizational meeting of the [C]orporation." He has never participated in any stockholders meeting, and he has never received notice of any stockholders meeting.

---

4. The equipment lease of April 1, 1988 is signed on behalf of the Corporation by Brownlow, without any identification of his office, if any, in the Corporation. On the financing statement executed at the same time Brownlow identifies himself as president of the Corporation.

5. That attorney was other than Jones's present trial and appellate counsel.

The instant action against the Corporation was filed in the Circuit Court for Cecil County in January 1991. The complaint, as amended, seeks a mandamus compelling the Corporation to permit inspection of certain records by Jones (Count I), a decree of specific performance directing the Corporation to issue twenty-five percent of its stock to Jones (Count II), and, in the alternative, the rental value of Jones's equipment used at the Site prior to the equipment lease of April 1, 1988 (Count III). The circuit court entered judgment for the Corporation on Count III, concluding that it was barred by limitations. Jones does not contest that judgment on this appeal.

The circuit court entered judgment for the Corporation on Counts I and II on the ground that Maryland Code (1975, 1992 Repl.Vol.), § 8–319 of the Commercial Law Article (CL) barred enforcement of the alleged oral contract. CL § 8–319 in relevant part reads:

"A contract for the sale of securities is not enforceable by way of action or defense unless:

(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;

(b) Delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within 10 days after receipt of the initial transaction statement confirming the registration, or payment has been made but the contract is enforceable under this provision only to the extent of the delivery, registration or payment...." [6]

---

**6.** The remaining subsections of CL § 8–319 read:

"(c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and

Underlying U.C.C. Art. 8 is the theory "that all types of investment securities, whether creditor or equity interests, are sufficiently similar that a single enactment can adequately regulate their transfer and registration and state the same rules of 'negotiability.'" E. Folk, *Some Problems Under Article 8 of the Uniform Commercial Code,* 5 Ariz.L.Rev. 193, 193 (1964). Article 8 "is not concerned with the issue of securities, or with their public distribution, as are corporation and securities statutes." *Id.* A similar general description of the scope of Art. 8 was expressed to the Governor and General Assembly of Maryland prior to this State's enactment of the U.C.C. by Chapter 538 of the Acts of 1963. *See* Report of the Commission to Study and Report on the Uniform Commercial Code 28 (1963) ("[Article 8] does not replace our corporate law with respect to the fundamental validity of a security or with respect to corporate power to issue or the mechanics of issuance except to recognize the invalidity of an overissue.").

Here, the oral contract, as described by Jones, relates to stock to be issued by a corporation to be formed, and the agreement is made between persons who are to be stockholders in the contemplated corporation. The Corporation's argument silently assumes that Art. 8 applies to pre-incorporation, shareholders' agreements. Jones does not argue to the contrary. The circuit court acted on that assumption. Consequently, we shall also assume, but solely *arguendo,* the unstated premise of the Corporation's argument.

The Court of Special Appeals took a different tack. Under its interpretation of the oral agreement Jones promised "to prepare the [S]ite for a sand and gravel removal operation, an employment undertaking that clearly involved [Jones's] performance of a service, in exchange for a percentage of stock in a corporation to be formed." *Jones,* 97 Md.App. at 94, 627

---

he has failed to send written objection to its contents within 10 days after its receipt; or

(d) The party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for the sale of a stated quantity of described securities at a defined or stated price."

A.2d at 63 (footnote omitted). The intermediate appellate court then applied a line of decisions holding that U.C.C. § 8–319 does not apply to employment contracts. *Id.* In so doing, the Court of Special Appeals treated the total relationship between Jones, Franey, and the Corporation as if it were embodied in a single, indivisible contract. The circuit court, however, made no express finding on this aspect of the case. Jones's testimony had emphasized that Jones was contributing, rent free, the use of his equipment to the business of the Corporation, in contrast to the cash contributions which Jones anticipated would be made by Franey and Driggs. The record permits a finding that two separate contracts were made or attempted to be made, or, if a single contract were made, that it is divisible. Under one contract, or part of the contract, the Corporation paid Jones a gross salary of $800 per week for his knowledge, experience, and services; under the other contract, or part of the contract, Jones was to be issued twenty-five percent of the Corporation's initial stock issuance in consideration of the rent free use of Jones's equipment. If the circuit court determines on remand that there are two contracts, or that the single contract is divisible, then it is immaterial whether a promise to issue stock in consideration of services falls within or without CL § 8–319.

When the Court of Special Appeals held that a contract of employment or for services was not "[a] contract for the sale of securities" within the meaning of CL § 8–319, the court adopted the rationale of *Baldassarre v. Singer,* 444 Pa. 100, 282 A.2d 262 (1971). In that case two chemists had left existing employment in order to work for a new employer for a salary and the promise of ten percent of the employer's stock, to be divided between them. Eighteen months later they were discharged, without ever having received the stock. There was no memorandum in writing. In determining whether U.C.C. § 8–319 barred enforcement of the agreement, the Pennsylvania Supreme Court looked to Art. 2 of the U.C.C. for the definition of a "sale." It noted that under § 2–106 it "consists in the passing of title from the seller to the buyer for a price." The court considered that "[t]here is no

'price' for stock transferred pursuant to an employment contract. The only consideration is the employment itself." 282 A.2d at 264.[7]

*Burns v. Gould,* 172 Conn. 210, 374 A.2d 193 (1977), illustrates the contrary view. The Connecticut court would not "emphasize one side of the contract and ignore the other." 374 A.2d at 199. The court reasoned that "[i]t has never been held that contracts calling for land on one side and services on the other are outside the statute of frauds because they are contracts of 'employment' rather than for the sale of land." *Id.*[8]

In the case before us, we need not choose between these competing analyses. If the Corporation is correct in contending that under CL § 8–319 "[a] contract for the sale of securities" takes its character based on securities as the subject of the transfer (or issuance), and not based on the nature of the consideration paid for the securities, the instant record nevertheless permits a finding that Jones satisfied the statute by the payment alternative provided in CL § 8–319(b). Under the testimony as it now stands, and if believed, Jones made payment in full by providing his equipment, rent free,

---

7. *Baldassarre* has been followed by federal courts applying Pennsylvania law in diversity cases. *See Hiller v. Franklin Mint, Inc.,* 485 F.2d 48 (3d Cir.1973); *McDermott v. Russell,* 523 F.Supp. 347 (E.D.Pa.1981). Professor Hawkland also takes the view that "[a] contract of employment is generally not thought of as a sale, and should not be so considered for purposes of Article 8." W. Hawkland, R. Alderman & W. Schneider, U.C.C. Series § 8–319:02, at 385 (1986). Hawkland also notes "that in most 'employment' cases, § 8–319 will be satisfied pursuant to the payment exception found in U.C.C. § 8–319(b)." *Id.* at 386 n. 13.

8. Section 8–319 has been applied to employment contracts in *Mildfelt v. Lair,* 221 Kan. 557, 561 P.2d 805 (1977); *Renfroe v. Ladd,* 701 S.W.2d 148 (Ky.Ct.App.1985); *Goldfinger v. Brown,* 169 A.D.2d 702, 564 N.Y.S.2d 459 (1991); *Newman v. Crazy Eddie, Inc.,* 119 A.D.2d 738, 501 N.Y.S.2d 398 (1986); *Gross v. Vogel,* 81 A.D.2d 576, 437 N.Y.S.2d 431 (1981); *Bingham v. Wells, Rich, Green, Inc.,* 34 A.D.2d 924, 311 N.Y.S.2d 508 (1970); *Beta Drilling, Inc. v. Durkee,* 821 S.W.2d 739 (Tex.Ct.App.1992); *Bowers Steel, Inc. v. DeBrooke,* 557 S.W.2d 369 (Tex.Ct.App.1977); and *Quinn v. Beverages of West Virginia, Inc.,* 159 W.Va. 571, 224 S.E.2d 894 (1976).

until the Corporation was in a financial position to pay rent, as it did beginning April 1, 1988.[9]

The Corporation contends that § 8–319 cannot be satisfied by performance in this case. The argument rests on incorporating into "payment," as used in § 8–319(b), a concept borrowed from the part performance exception to the statute of frauds applicable to contracts involving realty, namely, that "such performance necessarily and unequivocally evidences the existence of the oral agreement." Appellant's Reply Brief at 1–2. From the factual standpoint, the Corporation submits that Jones failed to meet this standard. We agree that there is an evidentiary component to the payment alternative under § 8–319(b) that requires the transferee's performance to relate to the existence of a contract, but we do not agree that Jones's evidence is legally insufficient to meet that standard, properly interpreted.

"Unequivocally referable" is the terminology used by courts of New York in deciding whether U.C.C. § 8–319 has been satisfied by full or part payment. *See Goldfinger v. Brown,* 169 A.D.2d 702, 564 N.Y.S.2d 459 (1991); *Newman v. Crazy Eddie, Inc.,* 119 A.D.2d 738, 501 N.Y.S.2d 398 (1986); *Gross v. Vogel,* 81 A.D.2d 576, 437 N.Y.S.2d 431 (1981); *Palmerton v. Envirogas, Inc.,* 80 A.D.2d 996, 437 N.Y.S.2d 483 (1981); *Mortimer B. Burnside & Co. v. Havener Securities Corp.,* 25 A.D.2d 373, 269 N.Y.S.2d 724 (1966). The opinion in *Burnside* explains the requirement as follows:

> "To bring it within that exception the act of performance must be 'unequivocally referable' to the promise alleged to have been made. If this were not so, any act may be claimed to be performance in reliance on any promise the actor chooses to assert against anyone. The rule that performance must be unequivocally referable to the alleged

---

**9.** In the Court of Special Appeals Jones argued that he had complied with § 8–319 by full performance, but that court had no need to reach the issue, in view of its alternative holding. *Jones,* 97 Md.App. at 95, 627 A.2d at 64. Jones also raised his full performance argument in answer to the Corporation's petition for certiorari.

promise implements and serves the purpose of the statute of frauds."

269 N.Y.S.2d at 726–27 (citations omitted).

Similar terminology has been used in appellate decisions in this State dealing with whether part performance has taken an oral, real estate contract out of the statute of frauds. *See Boehm v. Boehm,* 182 Md. 254, 266, 34 A.2d 447, 452 (1943); *Hamilton v. Thirston,* 93 Md. 213, 219, 48 A. 709, 711 (1901); *Snyder v. Snyder,* 79 Md.App. 448, 456, 558 A.2d 412, 416 (1989). We reviewed the part performance doctrine in *Unitas v. Temple,* 314 Md. 689, 552 A.2d 1285 (1989), where we cautioned "that the language used in some of this Court's early opinions to express the evidentiary component of the part performance doctrine is not to be applied in an absolutely literal fashion." *Id.* at 707, 552 A.2d at 1294. We quoted approvingly from J. Pomeroy, *Specific Performance of Contracts* § 107 (3d ed. 1926) (Pomeroy), where the author concludes that

"[t]he true rule is, that the acts of part performance must be such as show that some contract exists between the parties; that they were done in pursuance thereof, and that it is not inconsistent with the one alleged in the pleading."

*Id.* at 708, 552 A.2d at 1294. In *Unitas* we said that the quotation from Pomeroy set forth immediately below "more accurately encapsulates the rule actually applied in the more recent part performance cases of this Court than [did] the statement in [an earlier decision]."

" ' "It is generally of the essence of such an act (of part performance) that the court shall, by reason of the act itself, without knowing whether there was an agreement or not, find the parties unequivocally in a position different from that which, according to their legal rights, they would be in if there were no contract." ' "

*Id.* at 709, 552 A.2d at 1294 (quoting Pomeroy at 259 n. 2, quoting *Dale v. Hamilton,* 5 Ha. 369, 381 (1846)).

The Corporation contends that, under the *Unitas* test, the transfer by Jones of his plant equipment and rolling stock

from Crofton to the Site can be explained by Jones's desire to sell the equipment to the Corporation. Under Jones's evidence, however, the bulldozer was used at the Site from August 1985 through March 1988, the loader from November 1985 through March 1988, and the plant equipment from March 1987 through March 1988. The rent free use for so long a time of equipment that has a substantial market rental value is referable to the existence of a contract between Jones and the Corporation relating to consideration in some form for its use, absent any evidence that a gift was intended.

In any event, in the instant matter, we "find the parties unequivocally in a position different from that which, according to their legal rights, they would be in if there were no contract." *Unitas,* 314 Md. at 709, 552 A.2d at 1294 (interior quotation marks omitted). The Corporation was formed as a close corporation under the Maryland close corporation statute, Md.Code (1975, 1993 Repl.Vol.), §§ 4–101 through 4–603 of the Corporations and Associations Article (CA). As the proof in this case now stands, Jones is the sole director of the Corporation, and there has never been an organizational meeting or any stock issued. The charter provides that "[a]fter the completion of the organizational meeting of the director and the issuance of one or more shares of stock of the Corporation, the Corporation shall have no Board of Directors."

Under the particular form of close corporation charter adopted by the Corporation, see CA § 4–302(a),[10] it is Jones who would authorize the issuance of stock and set the, or recognize the agreed upon, minimum price or value of the consideration, other than money, for the stock of the Corpora-

---

**10.** CA § 4–302(a) provides:

"(a) *Effective time of election.*—An election to have no board of directors becomes effective at the later of:

(1) The time that the organization meeting of directors and the issuance of at least one share of stock of the corporation are completed;

(2) The time the charter document in which the election is made becomes effective; or

(3) The time specified in the charter document in which the election is made."

tion, *cf.* CA § 2–203(a) and (b).[11] *See also* W. Hall, *The New Maryland Close Corporation Law,* 27 Md.L.Rev. 341, 358–59 (1967) ("The provision . . . that the elimination of directors will become effective only after there has been an issuance of stock is cumbersome, but is required by the practical necessity of designating someone who can carry out the first stock issuance. Without it, the elimination of the directors would leave no one available to issue the initial stock.").

We have emphasized that "power" was conferred on Jones as sole director of this close corporation, without undertaking to determine under the Maryland law of corporations what might be the ultimate legal or equitable rights of interested persons. For purposes of the statute of frauds issue under CL § 8–319 the significance is that, on this record, any expectant initial shareholder in the Corporation, other than Jones, would have to rely (excluding possible judicial relief) on Jones's recognition of that person's entitlement to be issued stock and of the amount thereof. That conferral of power on Jones satisfies the evidentiary component of the performance alternative under CL § 8–319.[12]

---

**11.** CA § 2–203(a) and (b) provide:

"(a) *Board resolution.*—Before the issuance of stock or convertible securities, the board of directors shall adopt a resolution which:
(1) Authorizes the issuance;
(2) Sets the minimum price or value of consideration for the stock or convertible securities or a formula for its determination; and
(3) Fairly describes any consideration other than money and states:
(i) Its actual value as determined by the board of directors; or
(ii) That the board of directors has determined that the actual value is or will be not less than a certain sum.
(b) *Effect of determination.*—In the absence of actual fraud in the transaction, the value of consideration stated in the charter or determined by the board of directors in its resolution is conclusive for all purposes."

**12.** CA § 4–101 presents definitions for words used in the Close Corporation Title of the Corporations and Associations Article. Section 4–101(c) provides that " '[u]nanimous stockholders' agreement' means an agreement to which every stockholder of a close corporation actually has assented and which is contained in its charter or bylaws or in a written instrument signed by all the stockholders." Neither any party, nor any court at any prior stage of this litigation, has cited to this

For the foregoing reasons the circuit court erred in entering judgment in favor of the Corporation on the ground that the oral contract was unenforceable under CL § 8–319. Accordingly, the Court of Special Appeals entered the correct mandate by reversing the judgment of the circuit court and remanding for further proceedings.[13]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, CECIL SAND & GRAVEL, INC.*

definition. We intimate no opinion on its effect, if any, on the oral agreement for which Jones contends.

**13.** We note that, although the charter names Jones as resident agent, service of the complaint in this case was directed to be made on another individual as resident agent of the Corporation, presumably because that other individual was so designated on the then current records of the State Department of Assessments and Taxation. We have also seen in reviewing the facts that Brownlow represented himself to be president of the Corporation, and Franey represented that there was a board of directors. On remand the circuit court will undoubtedly expect an explanation of whether, and if so, by what legal theory, any stock has been issued in the Corporation, and how corporate changes might have been effected, particularly if the circuit court finds as a fact that Jones is accurate in his testimony that, as sole director, he has never taken the action that would be taken at an organizational meeting of a corporation.