Rel: December 15, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

—————————————

## CR-20-0751

—————————————

## Brandon Blaine Berry

### v.

## State of Alabama

## Appeal from Jackson Circuit Court
## (CC-18-1235 and CC-18-1236)

McCOOL, Judge.

Brandon Blaine Berry appeals his convictions for murder, see § 13A-6-2(a)(1), Ala. Code 1975, and first-degree kidnapping, see § 13A-6-

43, Ala. Code 1975, and his resulting consecutive sentences of life imprisonment. Berry was also ordered to pay a $60,000 fine, $10,000 to the Alabama Crime Victims' Compensation Fund, court costs, and attorney fees.

Facts and Procedural History

The following evidence was presented at trial:

On the morning of September 6, 2018, Deputy Craig Holcomb with the Jackson County Sheriff's Office encountered David Rivamonte, who was walking on the edge of the railroad tracks near Whitaker Preserve. Rivamonte informed Deputy Holcomb that he was walking from Huntsville to Arab. Rivamonte declined Deputy Holcomb's offer to give him a ride to the county line; however, Rivamonte complied with Deputy Holcomb's request that he walk along the highway instead of walking behind the residences along the train tracks. Later that same day, Deputy Holcomb observed Rivamonte approximately two and one-half miles further than he had been earlier, traveling toward Woodville or Scottsboro.

On September 8, 2018, Rivamonte's mother reported him missing after he had left home on the night of September 5, 2018. Investigator

2

Ricky McCarver generated a report and a issued a "be-on-the-lookout" sheet, also known as a "BOLO sheet," with information about Rivamonte so that other law-enforcement officers could see that he was considered a missing person. (R. 85-86.) The BOLO sheet stated that Rivamonte had run away before and that Rivamonte was a "high-functioning autistic man" that "does not drive, but hitchhikes." (R. 87.)

Ricky Bozarth testified that he was fishing on the river in Woodville on September 6, 2018, when he heard someone yelling and trying to get his attention. Bozarth saw a man standing on a "little island … in the middle of the river." (R. 94.) Bozarth stated that the man, who was later identified as Rivamonte, asked him about whether he would be able to stay at the river, and Bozarth told him that he had "just as much right to stay there as anybody." (R. 96.) Bozarth "pitched" Rivamonte a can of Mountain Dew and a can of Vienna Sausage because Rivamonte was thirsty and hungry. (R. 97.) According to Bozarth, Chevy Swinford arrived at the river shortly thereafter. Swinford lived in a tent on the river approximately 50 yards from where Bozarth had been fishing that day. Swinford had a white Chevrolet truck that he also kept parked by the river. When Swinford arrived, Bozarth told Swinford that Rivamonte

3

had mentioned "something about staying over here with y'all or something." (R. 97.) Bozarth claimed that Swinford paddled a small boat over to the island to get Rivamonte and that then the two men paddled up the river in the boat. Bozarth testified that the men and the boat went out of sight for two or three hours.

Bozarth testified that when Swinford and Rivamonte returned to the campsite, the three men hung out for a while until they decided to go to the Mapco store to get something to eat and drink. Bozarth testified that he drove himself to the Mapco store in his own vehicle and that Rivamonte rode with Swinford in Swinford's truck. According to Bozarth, Brandon Berry was also at the Mapco store. After leaving the Mapco store, Bozarth went back to his house in Woodville. Bozarth claimed that Berry, Swinford, and Rivamonte went to camper in which Berry lived, where they were planning on "finishing up a tattoo … and initiating [Rivamonte] into some kind of [white supremacist] group." (R. 103-4.)

Bozarth testified that, later in the evening, he went to Berry's camper. When Bozarth arrived, Berry, Swinford, Rivamonte, and a girl were inside the camper. Swinford and Berry were talking, and Rivamonte was sitting in a chair, without a shirt, with a piece of tape over his mouth

4

and a handcuff on his right hand. According to Bozarth, a few minutes later, Swinford put a sawed-off shot gun to Rivamonte's lips. Bozarth assumed these actions were all part of the alleged initiation process. According to Bozarth, Rivamonte appeared to be unharmed. Berry asked Bozarth for his pistol, and Bozarth handed the pistol to either Berry or Swinford. Bozarth's pistol was an "Accu-Tek .380." (R. 112.) Bozarth stated that he handed over his pistol because he had previously discussed with Berry the possibility of trading the pistol for Berry's "little red car." (R. 109.) Bozarth claimed that he then left the camper at the request of Berry or Swinford in order to return to the river to pick up some of Rivamonte's belongings that had been left at the river.

According to Bozarth, he returned to the river to collect Rivamonte's belongings and then went by his house to eat. Approximately one hour later, Bozarth claimed, he returned to Berry's camper; however, when he arrived, no one was there. Bozarth testified that Swinford and Berry returned two or three hours later in Swinford's truck. Bozarth handed Rivamonte's belongings to Berry and Swinford, and Berry removed the battery from Rivamonte's cellular telephone. Berry invited Bozarth to

look under the blue tarp that was in the back of the truck. However, Bozarth refused to look under the tarp.

Bozarth testified that he eventually got his pistol back from Swinford about six or seven days later and that the pistol had a "groove cut in the side toward the end of the barrel." (R. 117.) When Bozarth asked Swinford about it, Swinford stated that Berry had "notched it" to signify that "he had done something." (R. 118.) Bozarth also testified that, in his statement given to Investigator Rick Bremmer of the Jackson County Sheriff's Office, he had stated: "If I remember, I overheard [Berry] tell someone that he had the guts to do what [Swinford] didn't." (R. 137.)

Swinford testified that on September 6, 2018, when he returned to his campsite at the river where he had been living, Rivamonte was on an island. Swinford stated that he rowed his boat over to where Rivamonte was located on the island to take Rivamonte food and water. Rivamonte got in the boat with Swinford, and the two men went fishing for about 30 minutes while Rivamonte ate the food that Swinford had given him. After Rivamonte told Swinford that he was still hungry, the men returned to the campsite and went in Swinford's white Chevrolet truck to the Mapco store to get more food. While at the Mapco store, Swinford saw Berry and

6

spoke to him before returning to the campsite on the river. Swinford testified that, on the way back to the campsite, Rivamonte told him that he had "raped a 10-year-old boy and a dog." (R. 584.) Swinford claimed that he then dropped Rivamonte off at the campsite and went to Berry's camper. When Swinford arrived at Berry's camper, Berry and Cloressa Cox, Berry's girlfriend, were there. Swinford told Berry about Rivamonte's claim that he had raped a 10-year old boy and a dog. According to Swinford, Berry told Swinford that he wanted to meet Rivamonte. Swinford stated that he and Berry "smoked a little weed" before Swinford returned to his campsite at the river. Swinford stated that he invited Rivamonte to go back to Berry's camper to get a tattoo.

Swinford claimed that, after arriving back at Berry's camper, Berry and Rivamonte were talking when Rivamonte suddenly "blurted out [that] he raped a 10-year old boy and a dog" and that Rivamonte was "bragging" about what he had done. (R. 590.) Swinford claimed that Berry was "heated" and began raising his voice. (R. 590.) Swinford stated that Bozarth then arrived at Berry's camper and Swinford went outside to talk to Bozarth. While Swinford was outside, Berry came outside and told Bozarth what Rivamonte had said. According to Swinford, Bozarth

7

handed Berry two white zip ties, and Swinford and Berry both went back inside the camper. Berry instructed Bozarth to go get Rivamonte's belongings from the river, and Bozarth left Berry's camper. Swinford testified that Berry asked Rivamonte if he would be willing to "shave his head and get a tattoo" because Rivamonte had told Berry and Swinford that he just wanted to "be like" Berry and Swinford. (R. 593.) When Rivamonte said "yeah," Berry told Rivamonte to "[c]ome on. I'm going to introduce to some real crackers. ... Let's go cut your hair." (R. 593.) Swinford testified that Berry and Cox got in Berry's vehicle and that he and Rivamonte got in Swinford's truck. Swinford then followed Berry to a mobile home, which was later determined to belong to Patrick Lee Turner.

According to Swinford, once the men and Cox arrived at Turner's mobile home, they all went inside. Swinford stated that he was "fearful" inside the mobile home, and he described the mobile home as "scary" because the kitchen cabinets and counters were covered in plastic, there was a blue tarp spread out on the kitchen floor, and there was a chair in the middle of the kitchen. (R. 596.) Berry told Rivamonte to sit in the chair, and Berry zip-tied him to the chair. Swinford said that he was in a

nearby room and that "it sounded like [Berry] hit [Rivamonte] a couple of times," so Swinford "leaned over and looked around, and [saw Berry hit Rivamonte] a couple more times." (R. 598.) Berry eventually untied Rivamonte and told him to go outside. Swinford stated that he went outside a few minutes later and saw Berry in the driver's seat of Swinford's truck. Rivamonte was in the passenger seat. According to Swinford, when he told Berry to get out of his truck, Berry pointed a pistol at Swinford and told him to get away from the truck and that he was taking Rivamonte "down the road." (R. 600.) Swinford claimed that Berry "slammed the door and sped off" and returned to Turner's mobile home without Rivamonte about five minutes later. (R. 601.) Berry got in his car and Swinford got in his truck. Swinford then followed Berry to Berry's camper.

Swinford testified that when he returned to Berry's camper, Berry told Swinford to come look under a tarp that was in the back of Swinford's truck, which Swinford had not noticed until arriving back at Berry's camper. When Berry lifted the tarp for Swinford, Swinford saw "part of a hand or some skin." (R. 603.) Swinford testified that he started "freaking out," but Berry told Swinford and Cox, "Y'all know too much. You can't

9

leave now." (R. 604.) Berry pulled a wheelbarrow over to Swinford's truck and started to pull Rivamonte's body out of the back of the truck. Swinford testified that he "puked," went to another camper on the Berry property, and "took four Xanaxes" before he accidentally "passed out" in the upper camper. (R. 604.) Swinford testified that he left the following morning.

On cross-examination, Swinford admitted that, at the time of the incident, he "periodically" used methamphetamine and other drugs. He testified that, when Berry dropped the tailgate on Swinford's truck and told him to look at it, Berry smiled as if he was of proud of what he had done. According to Swinford, Berry also told him that he had asked Rivamonte "if he wanted it in the back or front, and [Rivamonte] told him in the back." (R. 691.) Swinford claimed that Berry told him that he "shot twice" and that Rivamonte then turned around and told Berry that he had missed so Berry shot once more. (R. 691.) Later, Swinford testified that Berry may have shot only once from behind Rivamonte.

Matthew Justin Pruitt, Berry's best friend, testified that Berry called him on September 7, 2018, and asked for Pruitt's help. Pruitt identified photographs that were taken by Investigator Bremmer of

Pruitt's cellular telephone, which showed text messages that Pruitt had received from Berry. A picture that had been sent in one of the text messages was a picture of a body. The message had been sent at 6:00 a.m. on Saturday, September 8, 2018.

Raymond Thompson, Berry's cousin, testified that on Tuesday, September 11, 2018, he spoke with Berry, who asked Thompson for money. Thompson claimed that Berry later came to his house with a woman that Thompson did not know. According to Thompson, Berry began to tell him that "he killed this guy" that was a "child rapist" and that the man had told Berry that "he was going to rape [Berry's] little girl." (R. 193.) Thompson said that Berry claimed that "the girl held the guy at gunpoint" while Berry was beating the man. (R. 193.) Thompson testified that Berry claimed that, when he came outside to the truck on the evening of the incident, Swinford was outside and Berry told Swinford to "get in or get out of the way." (R. 194.) According to Thompson, Berry alleged that Swinford did not get in the truck. Thompson claimed that Berry told him that he then went outside and put the man in the truck and "took him down the road." (R. 194.) Berry also stated that the man told him, "You better go ahead and kill me because

11

if you don't your daughter will be next." (R. 194.) Thompson testified that when Berry was telling him the story of the incident, Berry appeared to be on drugs.

Investigator Bremmer testified that he had heard from more than one source that Swinford and Berry had been involved in the killing of someone. Investigator Bremmer knew that Swinford lived at the river, and, on September 12, 2018, he tried to visit Swinford; however, Swinford was not there. Investigator Bremmer identified photographs of Swinford's tent, his white truck, and the two-man boat that was on the riverbank. Investigator Bremmer stated that in the middle of the boat there appeared to be a bloodstain. According to Investigator Bremmer, Swinford's boat and truck were hauled to a secure building inside the jail. Investigator Bremmer also visited Berry's camper; however, Berry was not there. That same day, Investigator Bremmer visited Thompson, during which time he took Thompson's statement, and Pruitt, from whom he collected Pruitt's cellular telephone.

Investigator Bremmer interviewed Berry on September 13, 2018, and the video recording of that interview was played for the jury. Investigator Bremmer also identified multiple photographs taken during

his investigation of the Berry's property, including photographs of a front-end loader bucket on a tractor, wheelbarrows, and several random items of debris. While searching Berry's camper, officers noticed a path that appeared to have been recently "run through with a piece of equipment, and a fence post at the corner of the driveway and the county road [that] had either been run over [or] backed over." (R. 281.) Further investigation led to the discovery of a blue tarp containing a dead body, which was determined to be Rivamonte. The skull was not attached to the rest of the body.

Although Investigator Bremmer collected several samples to be tested from what appeared to be blood on the truck bed of Swinford's truck, there was no evidence of Rivamonte's blood or DNA found on Swinford's truck. There was also no evidence of Rivamonte's blood or DNA found at Berry's camper or Turner's mobile home.

Rivamonte's cause of death was determined to be a gunshot wound to the head. The autopsy indicated that Rivamonte also likely sustained injuries from traumatic head injuries. The class characteristics measured and observed by a forensic specialist on the projectile taken from

Rivamonte's head during his autopsy were "consistent with Accu-tek firearms." (R. 507.)

Turner testified that, in September 2018, Berry came by his mobile home and was "bragging" to Turner that "he was going to get his ranking or something" and that Berry was "a real motherfucker." (R. 733; 737.) Turner claimed at trial that he remembered talking to Investigator Bremmer around September 2018, that Investigator Bremmer wrote down a statement while he was talking, and that Turner signed the written statement. However, Turner also claimed at trial that his memory was failing due to health problems and that he could not remember exactly what he had told Investigator Bremmer. The prosecutor quoted to Turner portions of the written statement, which included statements that Berry had allegedly told Turner when he visited him in September 2018, and the prosecutor asked Turner whether he remembered telling Investigator Bremmer such information; however, Turner testified that he neither remembered Berry making such statements to him, nor remembered exactly what he had told to Investigator Bremmer.

Joseph McGeehee, Berry's cellmate when they both were at the county jail, testified that, when McGeehee arrived in the cell, Berry asked him if he "had a problem sharing a cell with a killer." (R. 774.) McGeehee also testified that he heard Berry tell another cellmate that Berry "killed a man from Paint Rock River." (R. 776.)

Ashley Pruitt ("Ashley") testified that Berry was her best friend. She claimed that, around midnight on Saturday, September 8, 2018, Berry's father, Donald, picked her up at her brother's house and brought her to his trailer, which was near Berry's camper, in order for Ashley to help Berry "clean up" his camper. (R. 485.) While she was at Donald's trailer, Berry came inside to get a lighter and then returned outside. Ashley stated that she followed Berry to check on him. She stated that there was a "real bad smell" and that Berry told Ashley that he needed help cleaning up "because he had a pedophile." (R. 787.) Berry indicated to Ashley that he had something in a wheelbarrow, and she said that there was a blue tarp in the wheelbarrow. Berry told Ashley that Swinford had shot someone. (R. 798.)

Cox testified that she was dating Berry at the time of the incident. She remembers being at Berry's camper the night of the incident when

15

Swinford and a man whom she did not know arrived. According to Cox, the men began arguing, and Berry and Swinford began hitting the other man. The man eventually left the camper and got into Swinford's truck. Cox testified that Swinford, Berry, the other man, and she all went to Turner's mobile home. Cox testified that she heard Swinford and Berry striking the man, who was sitting in a chair in the kitchen. Cox stated that later she observed Berry and the other man leave in Swinford's truck. According to Cox, a few minutes later, Berry returned in Swinford's truck alone. Cox testified that she then left and went back to her own house.

Deborah Baugh testified on behalf of the defense. Baugh claimed that she and a friend were involved in a dispute with Swinford in April 2019 and that Swinford stated that "he had already killed one, and he would not care to kill again." (R. 937.)

Jamie Ledbetter also testified on behalf of the defense. Ledbetter testified that, on September 6 or 7, 2018, he met Rivamonte, who was at the river with Swinford at the time. At that time, Ledbetter noticed that Rivamonte was wearing moccasins. The following day, Ledbetter saw Swinford at the river again. Ledbetter saw that Swinford was wearing

16

Rivamonte's moccasins. According to Ledbetter, he asked Swinford why he was wearing Rivamonte's shoes, and Swinford stated, "I killed him last night. I killed him." (R. 944.) At the time, Ledbetter did not believe Swinford. Swinford told Ledbetter that Rivamonte was a "pedophile" and that Rivamonte had told Swinford that he had raped a little girl and some animals." (R. 944.) Ledbetter testified that Swinford then nodded toward the bed of Swinford's truck, which is near the rail of the truck on which Ledbetter had been leaning. Ledbetter then looked and saw "blood and brain matter" in the bed of the truck. (R. 945.) Ledbetter claimed that Swinford then described the incident in detail to Ledbetter and that Swinford claimed that he had shot Rivamonte in the head twice.

The jury found Berry guilty of murder and first-degree kidnapping, and he was sentenced to consecutive terms of life imprisonment. Berry filed a motion for new trial, which was denied by operation of law. This appeal follows.

Discussion

I.

On appeal, Berry raises three arguments. First, Berry alleges that the trial court erred when it admitted a picture depicting Rivamonte's

17

body lying in the bed of a truck because, he says, the picture was not properly authenticated under Rule 901(a), Ala. R. Evid. At trial, during the State's direct examination of Matthew Pruitt, the State introduced, over the defense's objection, several photographs of text messages on a cellular telephone that were allegedly sent from Berry to Pruitt. The photographs of the text messages contained a picture of Rivamonte's body in the bed of a truck.

In his brief on appeal, Berry contends that, because "Pruitt never expressed any familiarity with the subject matter or accuracy of the contents of [the picture that he received] as is required for proper admissibility," it was improper to admit the picture under Rule 901(a). (Berry's brief at 25.) On the other hand, the State contends that the prosecution "was not attempting to authenticate the picture that Berry sent to the witness Matthew Pruitt"; instead, the State argues, the prosecution "was attempting to introduce a photograph of the cellular telephone depicting the picture that Pruitt received." (State's brief at 22-23.) The State further argues that Pruitt's testimony was not required "to identify the person depicted in the picture, or where the picture was taken, who took it or other such matters" but, instead, that "Pruitt's

18

identification of his own cellular telephone, the picture he had received and from who he received it was sufficient under Rule 901(a) to authenticate" the photograph of the cellular telephone. (State's brief at 24.)

"Alabama courts have often stated that a trial court has substantial discretion in determining whether evidence is admissible and that a trial court's decision will not be reversed unless its determination constitutes a clear abuse of discretion." Hosch v. State, 155 So. 3d 1048, 1081 (Ala. Crim. App. 2013) (citing Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000)). This Court recently explained:

> "Rule 901(a), Ala. R. Evid., provides that '[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' The authentication requirement is a relatively low threshold to meet. '[A]ll that is required under Rule 901' is that the proponent of the evidence make 'a prima facie showing that the [evidence] ... is likely authentic'; the proof of authenticity 'does not [have to] establish beyond a shadow of a doubt the authenticity of the [evidence]' and '"does not have to be conclusive or overwhelming."' Royal Ins. Co. of America v. Crowne Inv., Inc., 903 So. 2d 802, 809 (Ala. 2004) (quoting the Advisory Committee Notes to Rule 901). See also United States v. McDaniel, 433 F. App'x 701, 704 (10th Cir. 2011) ('We have repeatedly instructed that Rule 901[, Fed. R. Evid.,] sets a low bar for admissibility.')."

Harrison v. State, [Ms. CR-21-0423, August 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023). Ultimately, the question of authenticity is one for the trier of fact to decide, and it is the fact-finder's responsibility to weigh the evidence in determining authenticity. Tidwell v. State, 496 So. 2d 109 (Ala. Crim. App. 1986). See also Byrd v. Bentley, 850 So. 2d 232 (Ala. 2002); Advisory Committee's Notes to Rule 901, Ala. R. Evid.

Further, Rule 901(b)(1) provides that "[t]estimony that a matter is what it is claimed to be" is sufficient authentication "conforming with the requirements of this rule." Rule 901(b)(4) provides that evidence can be authenticated by "[d]istinctive characteristics and the like," including "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

In addressing the authentication of electronic evidence, this Court, quoting the Idaho Supreme Court, has stated:

> "'Other jurisdictions have recognized that electronic evidence may be authenticated in a number of different ways consistent with Federal Rule 901 and corresponding state statutes. Courts have not required proponents offering printouts of e-mails, internet chat room dialogues, and cellular phone text messages to authenticate them with direct evidence, such as an admission by the author or the testimony of a witness who saw the purported author typing the message. See, e.g., United States v. Fluker, 698 F.3d 988, 999 (7th Cir. 2012). Rather, courts have held that circumstantial

evidence establishing that the evidence was what the proponent claimed it to be was sufficient. See, e.g., State v. Thompson, 777 N.W.2d 617, 624 (N.D. 2010) (providing a comprehensive review of other jurisdictions' authenticity requirements for electronic communications). Circumstantial proof might include the e-mail address, cell phone number, or screen name connected with the message; the content of the messages, facts included within the text, or style of writing; and metadata such as the document's size, last modification date, or the computer IP address. See Fluker, 698 F.3d at 999; United States v. Siddiqui, 235 F.3d 1318, 1322-1323 (11th Cir. 2000); United States v. Safavian, 435 F. Supp. 2d 36, 40-41 (D.D.C. 2006).'

"[State v. Koch,] 157 Idaho 89, 334 P. 3d [280] at 287-88 [(2014)]."

Culp v. State, 178 So. 3d 378, 384 (Ala. Crim. App. 2014). Additionally, "[t]he proponent of the evidence needs to establish only a reasonable probability that the document is what it is claimed to be. Once this reasonable probability is shown, any inconclusiveness over the exhibit's connection with the events at issue goes to the exhibit's weight, not its admissibility." Id. at 385.

In Knight v. State, 300 So. 3d 76, 110 (Ala. Crim. App. 2018), this Court considered the authentication of screenshots of social-media pages when "[t]he State offered screenshots of what purported to be Knight's social-media profile on the Facebook social-media platform" that contained pictures that supported the State's theory of the case against

Knight. This Court held that the trial court did not abuse its discretion by admitting screenshots of the social-media pages when the police detective testified that he had found the pages under Knight's nickname, the social-media profile included pictures of Knight, and an El Camino automobile was pictured, "which dovetailed with Knight's own admission to the detective that he wanted an El Camino." Id. The police detective in Knight also testified that the screenshots had not been altered. As this Court again explained, "Rule 901 requires only a showing sufficient to indicate that the evidence is what it purports to be." Id.

In the present case, Pruitt testified that the photographs in question were photographs taken of his cellular telephone and that the photographs depicted text-message conversations between him and Berry. Pruitt testified about the context of the text conversations he had engaged in with Berry. He also identified the challenged picture as a picture that had been sent to him via text message by Berry. He claimed that the photographs "fairly and accurately depict the message that [he] received from [Berry]." (R. 168.) Although Berry contends that the picture of Rivamonte's body in the truck bed was not properly authenticated because Pruitt did not express familiarity with the subject matter or the

accuracy of the contents of the picture that had been sent to Pruitt, the record shows that the State was not separately presenting the picture of Rivamonte's body in a truck bed for authentication apart from the other text messages; rather, the State was presenting the picture for authentication as part of a number of purported text messages that Pruitt received from Berry in order to show that Berry had sent the picture of the dead body to Pruitt. Circumstantial evidence is sufficient to show that the evidence is what the State purported it to be, and here the evidence presented strongly indicates that the picture was indeed a part of the text messages that Berry sent to Pruitt. Therefore, the photographs of the text-message conversation, including the challenged picture within the text messages, were properly authenticated and admitted into evidence. Consequently, Berry is not entitled to relief on this claim.

## II.

Next, Berry contends that the trial court erred when it allowed a witness's recorded recollection to be read into testimony when the witness could not testify that the recorded recollection was true and correct pursuant to Rule 803(5), Ala. R. Evid.

23

During the trial, the State called Turner to testify, and the prosecutor sought to question Turner about what he had told Investigator Bremmer on September 19, 2018, regarding a conversation that had occurred between Berry and Turner shortly after the murder. At trial, Turner claimed that he did not remember what he had previously said to Investigator Bremmer. Outside the presence of the jury, during a voir dire examination, Turner was given a chance to read the written statement that Investigator Bremmer had prepared and Turner had signed. Turner indicated that he could not read the written statement. Thereafter, the State attempted to read portions of the written statement to Turner; however, Turner indicated that he did not remember the information contained in the written statement. He claimed that he remembered talking to Investigator Bremmer and that Investigator Bremmer "wrote down some stuff." (R. 750.) Turner also testified that he had initialed and signed the written statement that Investigator Bremmer had prepared during their discussion. However, Turner stated, although he remembered signing the written statement, he is unsure whether the written statement that Investigator Bremmer prepared is an accurate reflection of what Turner told Investigator Bremmer because

he never read the written statement before he signed it. Over defense counsel's objection, the State was allowed to question Turner about the contents of the written statement during various portions of its direct examination in front of the jury.

Berry argues on appeal that, because Turner was unable to confirm whether the written statement was an "accurate reflection of what [Turner] told [Investigator Bremmer]," Turner was unable to "properly adopt the statement as is required" by Rule 803(5). (Berry's brief at 28.) Thus, he claims, the written statement "should not have been read into the record." (Berry's brief at 29.)

The State contends that the prerequisites for admitting the written statement were met because "it can be reasonably and fairly inferred from the entirety of Turner's statement that Turner gave a statement to Investigator Bremmer." (State's brief at 26.) The State insists that because Turner "provided the information that was written," "identified his signature and initials on the statement," and did not deny that the information was true, the prerequisites for admission under Rule 803(5) were met despite the fact that Turner could not confirm the accuracy of the written statement. (State's brief at 26.)

25

As previously stated, the question of the admissibility of evidence is generally left to the trial court to determine, and the court's determination on that issue will not be reversed except upon a clear showing of abuse of discretion. See Hosch, 155 So. 3d at 1081. Rule 803(5) provides:

> "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> "....
>
> "(5) … A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly."

Additionally, the "elements" of a past recollection recorded have been stated by Professors Gamble and Goodwin as follows:

> "(1) That the witness personally observed the event or facts referred to in the memorandum or record, and that the memorandum or record was made or seen by the witness either contemporaneously with the event or when the witness'[s] recollection of the event was fairly fresh. It is not essential, to benefit from past recollection recorded, that the witness shall have made the memorandum or record. The memorandum or record may have been made by another person if the witness saw it when the event was fairly fresh in the witness'[s] memory.

"(2) That the witness then knew the contents of the memorandum or record and knew such contents to be true and correct. Where the witness testifies that the memorandum or record is in his own handwriting, the witness may testify further that he knows from his general practice of making writings of that kind that what he wrote was true.

"(3) That the witness possesses insufficient recollection, other than the testimony to the matters stated in (1) and (2) above, to enable him to testify fully and accurately."

(Charles W. Gamble, Robert J. Goodwin, and Terrence W. McCarthy, McElroy's Alabama Evidence § 116.03(2) (7th ed. 2020) (footnotes omitted).

In the present case, Turner admitted that he remembered Berry coming to his mobile home in September 2018. He also recalled portions of the conversation he had with Berry. However, he was unable to remember anything else that Berry had told him. The State, using the written statement Investigator Bremmer had prepared and Turner had signed, unsuccessfully attempted to refresh Turner's memory. Turner admitted to speaking with Investigator Bremmer shortly after the murder and after he had spoken to Berry. Additionally, although he could not remember everything that he had told Investigator Bremmer, he remembers Investigator Bremmer preparing the written statement and remembers initialing and signing the statement. Turner indicated that

those events that were recorded in the written statement occurred when his memory was more fresh because his memory had gotten worse recently due to a battle with sickness. Although Turner was unable to definitively state whether the written statement reflected exactly what he had told Investigator Bremmer because he could not recall exactly what he had said when he spoke to Investigator Bremmer, one can infer from the totality of Turner's testimony that the written statement reflected the information that Turner provided to Investigator Bremmer.

Regardless, even if the use of portions of the written statement was erroneous, the error would have been harmless. Rule 45, Ala. R. App. P., provides, in part:

> "No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of ... the improper admission or rejection of evidence ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."

This Court has further explained that "[t]he United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless." Whitehead v. State, 777 So. 2d 781, 847 (Ala. Crim. App. 1999)(citing Arizona v. Fulminante, 499 U.S. 278

(1991)) aff'd, 777 So. 2d 854 (Ala. 2000). "After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was." Davis v. State, 718 So. 2d 1148, 1164 (Ala. Crim. App. 1995), aff'd, 718 So. 2d 1166 (Ala. 1998). "The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing." Davis, 718 So. 2d at 1164. "'The admission of hearsay evidence in violation of the accused's constitutional right of confrontation is not automatically a ground for reversal.'" Chavers v. State, 714 So. 2d 341, 344 (Ala. Crim. App. 1997)(quoting Rouse v. State, 548 So. 2d 643, 647 (Ala. Crim. App. 1989)). "Erroneous admission of hearsay evidence is subject to a harmless-error analysis." Baird v. State, 849 So. 2d 223, 238 (Ala. Crim. App. 2002).

In the present case, the portions of the written statement that the State quoted were cumulative to the testimony provided by Swinford. This Court has repeatedly held that "[a]ny error in the admission of hearsay testimony [is] harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony." Belisle v. State, 11 So. 3d 256, 299 (citing McNair v. State, 706 So. 2d 828, 851 (Ala.

29

Crim. App. 1997)). See also <u>Gobble v. State</u>, 104 So. 3d 920, 958 (Ala.

Crim. App. 2010). Therefore, Berry is not entitled to relief on this ground.

### III.

Lastly, Berry argues that he was entitled to a new trial on the basis of juror misconduct because, he says, the veniremember who served as the foreperson of the jury failed to disclose his "close, personal relationship with the State's key witness." (Berry's brief at 17.)

In the present case, Berry filed a motion for new trial alleging, in part, that he was entitled to a new trial because the foreperson of the jury had committed juror misconduct.[1] Specifically, in his motion, Berry claimed that, two days after he was convicted, the trial court informed his trial counsel and the State that the foreperson of the jury, Juror J.H., had engaged in inappropriate communications about the case with a member of the court's staff prior to the jury's deliberations. Berry claimed that the communication between Juror J.H. and the member of the court's staff related to "the nature of [Juror J.H.'s] relationship with the

---

[1]Berry also alleged that he was entitled to a new trial because the State had failed to present sufficient evidence to convince the jury beyond a reasonable doubt that Berry should be convicted of murder and kidnapping. However, Berry does not raise this claim in his brief on appeal.

State's key witness, Chevy Swinford," who was also "the person alleged by the defense to be the actual murderer and kidnapper of the victim in this matter." (C. 244.) Berry claimed that Juror J.H. had not been forthcoming during voir dire about the extent and nature of his relationship with Swinford, which the defense alleged was more fraternal in nature than Berry was initially led to believe. In support of his argument in his motion for new trial, Berry claimed that Juror J.H. and Swinford "were 'tagged' together in multiple Facebook posts, wherein they are seen in photos with arms around each other and in which [they] refer to each other as 'brother.'" (C. 245.) He also claimed:

> "There are also multiple posts in which [Juror J.H. and Swinford] express affection for each other. Posts include expressions of love ('I truly love yall (sic)') and messages of adoration: 'Happy fathers (sic) day to the most awesome men I know! You have all touched my life in one way or another and ive (sic) been able to take something ive (sic) learned from you and apply it to my own life. However big or small youve (sic) made a difference in me and I want to thank you.'"

(C. 245.) Berry attached an affidavit from his trial counsel, as well as other exhibits, in support of his motion for a new trial.

The State did not file a response to Berry's motion for a new trial. Although the trial court set a hearing date for the motion for a new trial,

31

the hearing was scheduled for September 10, 2021, which was after the motion had been denied by operation of law. The trial court issued an order on September 13, 2021, stating:

> "The Defendant's motion for new trial was denied by operation of law 60-days after sentencing. <u>See</u> Rule 24.4, Alabama Rules of Criminal Procedure.
>
> "Further, based on the testimony and arguments made at a hearing conducted on September 10, 2021, the grounds for the Defendant's motion for new trial were not proven, and, to the extent possible under the law, the motion for new trial is also denied on its merits."

(C. 257.)

Because Berry was sentenced on June 29, 2021, the motion was denied by operation of law on August 30, 2021. <u>See</u> Rule 24.4, Ala. R. Crim. P.[2]

The Alabama Supreme Court has held that

> "[t]he proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court's precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. <u>See</u> <u>Ex parte Stewart</u>, 659 So. 2d 122 (Ala. 1993); <u>Campbell v. Williams</u>, 638 So. 2d 804 (Ala. 1994); <u>Union Mortgage Co. v. Barlow</u>, 595 So. 2d 1335 (Ala. 1992), cert. denied, 506 U.S.

---

[2]The 60th day was actually August 28, 2021; however, because that day was a Saturday, the motion was deemed denied the next business day, Monday, August 30, 2021. <u>See</u> Rule 1.3(a), Ala. R. Crim. P. <u>See</u> <u>also</u> <u>Bryant v. State</u>, 29 So 3d 928, 935 n.4 (Ala. Crim. App. 2009).

906, 113 S.Ct. 301, 121 L.Ed.2d 224 (1992). The 'might-have-been-prejudiced' standard, of course, casts a 'lighter' burden on the defendant than the actual-prejudice standard. See Tomlin v. State, [695 So. 2d 157, 170 (Ala. Crim. App. 1996)]…

"It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So. 2d 1253 (Ala. 1988). However, not every failure to respond properly to questions propounded during voir dire 'automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.' Freeman v. Hall, 286 Ala. 161, 166, 238 So. 2d 330, 335 (1970); see also Dawson v. State, [710 So. 2d 472, 474 (Ala. 1997)]; and Reed v. State, [547 So. 2d 596 (Ala. 1989)]. As stated previously, the proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is 'whether the defendant might have been prejudiced by a veniremember's failure to make a proper response.' Ex parte Stewart, 659 So. 2d at 124. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court's discretion. Eaton v. Horton, 565 So. 2d 183 (Ala. 1990); Land & Assocs., Inc. v. Simmons, 562 So. 2d 140 (Ala. 1989) (Houston, J., concurring specially).

"'The determination of whether the complaining party was prejudiced by a juror's failure to answer voir dire questions is a matter within the discretion of the trial court and will not be reversed unless the court has abused its discretion. Some of the factors that this Court has approved for using to determine whether there was probable prejudice include: "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the

33

juror to recollect, and the materiality of the matter inquired about."'

"Union Mortgage Co. v. Barlow, 595 So. 2d at 1342-43 (quoting Freeman v. Hall, supra (other citations omitted)). …

"The form of prejudice that would entitle a party to relief for a juror's nondisclosure or falsification in voir dire would be its effect, if any, to cause the party to forgo challenging the juror for cause or exercising a peremptory challenge to strike the juror. Ex parte Ledbetter, 404 So. 2d 731 (Ala. 1981); Warrick v. State, 460 So. 2d 320 (Ala. Crim. App. 1984); and Leach v. State, 31 Ala. App. 390, 18 So. 2d 285 (1944). If the party establishes that the juror's disclosure of the truth would have caused the party either to (successfully) challenge the juror for cause or to exercise a peremptory challenge to strike the juror, then the party has made a prima facie showing of prejudice. Id. Such prejudice can be established by the obvious tendency of the true facts to bias the juror, as in Ledbetter, supra, or by direct testimony of trial counsel that the true facts would have prompted a challenge against the juror, as in State v. Freeman, 605 So.2d 1258 (Ala. Crim. App. 1992)."

Ex parte Dobyne, 805 So. 2d 763, 771-72 (Ala. 2001) (footnote omitted).

In the present case, Berry filed a motion for new trial, in which he raised a potentially meritorious argument. He also supported his motion with exhibits containing evidence that was not presented at trial. However, his motion for new trial was denied by operation of law before the trial court held a hearing or ruled on the matter.

This Court addressed a similar situation in Stinson v. State, 964 So. 2d 684 (Ala. Crim. App. 2006), in which the trial court held a hearing

34

and took evidence on the defendant's motion for new trial after the 60-day period and subsequently entered an order denying the motion for new trial. This Court explained:

"Here, we have a situation similar to the one in Edgar v. State, 646 So. 2d 683, 685 (Ala. 1994), in which the trial court held a hearing on the motion for a new trial after the 60-day period; therefore, it did not take evidence until after the motion had already been denied by operation of law. Although the trial court, in Edgar, denied the motion, it failed to include in its order any specific findings. The Alabama Supreme Court held:

"'We hold that where, as here, a criminal defendant's motion for a new trial is denied under the provisions of Rule 24.4, Ala. R. Crim. P., without an affirmative statement by the trial judge giving the ruling a presumption of correctness and the defendant supports his new trial motion by evidence that was not presented at trial, and that evidence, if not controverted by the State, will entitle him to a new trial, the denial by operation of law should be reversed and the case remanded for the trial court to conduct a hearing on his motion for new trial and then enter an order either granting or denying the motion.'

"Edgar v. State, 646 So. 2d at 687.

"Additionally, this Court in Banks v. State, 845 So. 2d 9 (Ala. Crim. App. 2002), addressed a situation similar to the case at bar, having before it an affirmative response from the trial court denying a motion to withdraw a guilty plea, over which it no longer had jurisdiction because the motion had been denied by operation of law. Here, as in Banks, the trial court's written order has no legal significance, because the

35

trial court no longer had jurisdiction to rule on the motion for a new trial. Because this Court cannot consider any proceedings in the trial court that occurred beyond the 60-day limit, a remand is necessary to bestow jurisdiction on the trial court. Moreover, we are confident that the trial court, which presided over the trial and the hearing on the motion for a new trial, is in the best position to make any findings of fact regarding Stinson's claims. See, e.g., Vinnie v. State, 866 So. 2d 1175, 1176 (Ala. Crim. App. 2002)."

Stinson, 964 So. 2d at 686.

Based on the foregoing, this case is remanded, and the trial court is directed to either review the transcript of the hearing on Berry's motion for a new trial or to conduct any additional proceedings it deems necessary and to issue an order, making specific findings of fact regarding Berry's juror-misconduct claim. The record on return to remand shall include a copy of the transcript of any proceedings used to make a determination on this claim, as well as the trial court's specific written findings of fact. Due return shall be made to this Court no later than 56 days from the date of this opinion.

REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur in the result.